## SHIMAN v. COMMISSIONER OF INTERNAL REVENUE.

### No. 168.

Circuit Court of Appeals, Second Circuit.

July 5, 1932.

David S. Pollock, of New York City, for appellant.

G. A. Youngquist, Asst. Atty. Gen., and Sewall Key and John MacC. Hudson, Sp. Assts. to Atty. Gen. (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and

G. D. Brabson, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

### L. HAND, Circuit Judge.

In July, 1920, Shiman, the taxpayer, guaranteed four brokers' accounts for his brother-in-law, Oppenheim, who was speculating in stocks. One of these was Oppenheim's own, one was Shiman's, one belonged to Oppenheim's wife, in the fourth Shiman and others were interested. At the time of the guaranty Shiman thought Oppenheim solvent, as he was, and the transaction was of the ordinary kind, though influenced no doubt by the relationship of the two. Thereafter, Oppenheim fell into financial straits and became insolvent, though he still retained a small salary susceptible in part to garnishment. The parties do not however rely upon this as a resource; the case has been disposed of on the assumption that nothing could be recovered from him. In October, 1924, the brokers made a demand upon Shiman under his guaranty for ten thousand dollars to be applied upon the account in which Oppenheim was alone interested, and Shiman was forced to respond. At that time the brokers had collateral against this account, some of which at any rate was Shiman's. The record is not clear whether any of it that had value was Oppenheim's, but we must assume that some was his, the amount being in doubt. This payment kept the account open for the rest of the year, but in 1925 it was closed out, and Shiman was forced to make good the deficit, this time amounting to twenty-six thousand dollars more. He claimed the payment of October, 1924, as a loss, or a worthless debt, in his income tax return for 1924, and the Commissioner disallowed it. Upon appeal to the Board he was again unsuccessful and this appeal followed.

The objections are, first, that the payment created no debt from Oppenheim to Shiman at all, because at the time he was known to be insolvent, and a payment to an insolvent's use cannot be made with intent to create a debt; it is to be treated as a gift. At least, the taxpayer, who has the burden, must show that it is not a gift, and this Shiman failed to do. No doubt a man may pay money for another's use, from which a promise to repay is normally inferred, without in fact meaning to create a debt. The relations of the parties may show that it was a gift, just as they may show that any expressions which ordinarily import a contract, are understood by both sides not to create one. New York Trust Co. v. Island Oil & Transport Corp'n, 34 F. (2d) 655 (C. C. A. 2); Williston § 21. Indeed, if the putative lender knows that the borrower is without resources and likely never to have any, it may be reasonable with nothing further, to assume that he merely means to give the money. The conduct of neither party would in that case have its usual implication, and no contract would result. In the case at bar there was no reason to suppose, when Shiman guaranteed the accounts, that Oppenheim would be unable to make him whole. Oppenheim was then solvent, and his promise, implied from the facts, was as authentic as any other. Nobody disputes that this is the common understanding, or that a contract results from it. Oppenheim's obligation was indeed conditional upon Shiman's to the brokers. Only in case Shiman was called upon to perform, was Oppenheim to repay him; no debt arose between the two till Shiman paid, though as soon as he did, Oppenheim owed him the amount at once. But it made no difference that when Shiman did in fact pay, the situation had become such that, had he then voluntarily done so, the advance would have been a gift. He was forced to pay by his earlier undertaking, which from 1920 forward bound his freedom of choice. It has indeed been at times debated whether a conditional obligation is an obligation at all until the condition is fulfilled, but the dispute is scholastic. Except so far as the doctrine of anticipatory breach may require, a promise to perform in the future, whether absolute or conditional, does not circumscribe the conduct of the promisor meanwhile; it limits his freedom only when the time arrives, or if the event occurs. Nevertheless, that limitation has all along been fixed by the promise, and requires no further consent by the promisor to hold him. He has subjected himself to events beyond his control. So it is absurd to treat the performance as it would have been had it been freely made at the time. That cannot be a gift which the putative giver was powerless to withhold.

Next the Commissioner says that in any event there can be no deduction because Shiman suffered no loss; the debt was worthless at the moment it arose, for Oppenheim was then insolvent and known to be. If the deduction had been for the loss of purchased property, this would be clearly untrue. The statute, section 204 (a) and (b) of the Act of

1924, 26 USCA § 935 (a, b) and note, fixes the "cost" of property acquired after March 1, 1913, as the basis for losses which may be deducted under section 214 (a) (4,5), 26 USCA § 955 (a) (4, 5). A man who buys property at more than its value, does not forfeit his deduction by his bad judgment. It is immaterial to prove that he could have got it for less; he is taxed upon his actual net income, not on what another, more sagacious, might have secured. But this was not a deduction for a loss under section 214 (a) (4) or (5), to be calculated under section 204 (a) and (b); it was for a debt "ascertained to be worthless and charged off within the taxable year." Section 214 (a) (7), 26 USCA § 955 (a) (7). Though there was no debt until Shinan paid the brokers, it then became such at once and was known to be worthless as soon as it arose; verbally at any rate there is no difficulty. Nor is there any reason to impute a purpose to except such cases; the loss is as real and unavoidable as though the debt had had some value for a season. The analogy of section 204 (b) is apt. We can see no ground therefore for question except some of the language used in Eckert v. Burnet, 283 U. S. 140, 51 S. Ct. 373, 75 L. Ed. 911, taken from our opinion in 42 F.(2d) 158. That was quite another situation. Eckert, the taxpayer, had been an accommodation endorser for a corporation which became insolvent. When called upon to pay he gave his note instead, not payable within the year. The court refused to allow the deduction, because Eckert was keeping his books on a cash basis, but it intimated that when he paid he might succeed; until then he had done no more than change the form of the obligation. Yet if it were enough to defeat him that the debt was "worthless when acquired," the same objection ought to be good after he had paid; contrary to what was suggested. We cannot therefore think that the language so thrown out was intended as an authoritative statement by which we must be bound.

■ The debt was "ascertained to be worthless" in 1924. It is true that Oppenheim may have had securities in the account of his own which had value, side by side with Shiman's; we have already mentioned the possibility. The argument is that until the account was closed out the debt was not ascertained; Oppenheim was not obliged to pay until then. This misconceives the relation. Shiman remained contingently bound to pay the balance, when the account was closed; he had guaranteed to do so. Until then Oppenheim owed him nothing as to that. But the payment in October, 1924, created a debt, independently of whether Shiman might later have to pay more; it was money paid to Oppenheim's use for which he became liable at once. True, when the account was closed he might have an equity, even after Shiman's collateral was released; but that did not affect the debt arising from the payment. It was relevant only so far as the collateral at its value in October, 1924, might be said to be an asset available in payment of the advance then made. The account, even after the payment, still showed a heavy debit, secured in part by Shiman's collateral. We cannot demonstrate from the record that if that were taken out the debit was more than the value of Oppenheim's collateral, but nothing of the sort is suggested, and we are not disposed to press so far the taxpayer's burden of proof. That possibility is the merest speculation, and it fairly appears that the debt was "worthless."

■ There remains only the question whether it was "charged off" in 1924. Shiman kept no books and could "charge off" nothing in the usual sense. The phrase was apparently introduced to prevent a taxpayer from reserving a loss at his option until his income was large and his surtax high [Avery v. Commissioner, 22 F.(2d) 6 (C. C. A. 5), 55 A. L. R. 1277], but it was not meant to limit deductions to persons whose affairs were formally managed. Some courts have indeed gone so far as to say that a mere unexpressed determination to abandon the debt is enough. Jones v. Commissioner, 38 F.(2d) 550 (C. C. A. 7); Stephenson v. Commissioner, 43 F. (2d) 348 (C. C. A. 3). Possibly that would not suffice (article 151, Regulations 65), but here it seems to us that Shiman's examination of Oppenheim with the view of learning whether he could collect, his failure to discover any assets and his abandonment in fact of any effort, must be taken as determining the loss "by a closed and completed transaction," in the language of article 151. He had "charged off" the debt, so far as he could do so without some formal declaration. It was not likely that he should make one to Oppenheim; there was nobody else for him to address. Unless we are to confine the phrase to entries in books of account, this situation is as good as we are likely to find.

Order reversed, cause remanded.