### FOX v. COMMISSIONER OF INTERNAL REVENUE.

No. 205, Docket 21889.

United States Court of Appeals Second Circuit.

Argued May 10, 1951.

Decided July 2, 1951.

---

Harold Wisan, of New York City (Albert Krassner, of New York City, on the brief), for petitioner.

Helen Goodner, Sp. Asst. to Atty. Gen. (Theron Lamar Caudle, Asst. Atty. Gen., and Ellis N. Slack, Robert N Anderson, and Fred E. Youngman, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before SWAN, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

Agnes I. Fox, the taxpayer and petitioner for review, in 1935 entered into a written guaranty of certain debts of her husband and now seeks to deduct as a loss from her 1944 income the sum of $15,000 paid by her on the guaranty in that year. The Tax Court treated the payment as a "non-business" bad debt, subject to deduction only to the extent of a short-term capital loss, viz., $1,156.25. 14 T.C. 1160 (one judge dissenting). We agree with the taxpayer, however, that she has brought herself within the statutory definition of a loss from a "transaction entered into for profit" and hence is entitled to the deduction in full.

The statute upon which petitioner relies is I. R. C. § 23(e), 26 U.S.C.A. § 23(e), which permits an individual taxpayer to deduct "losses sustained during the taxable year and not compensated for by insurance or otherwise—

"(1) if incurred in trade or business; or

"(2) if incurred in any transaction entered into for profit, though not connected with the trade or business." In assessing the deficiency the Tax Court relied on a new provision effective with the 1943 tax—see Act Oct. 21, 1942, § 124(a)—entitled "Non-business debts" and providing, in the case of a non-corporate taxpayer, that "if a non-business debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months." It also provided that the term "non-business debt" meant one "other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business." I. R. C. § 23(k) (4), 26 U.S.C.A. § 23(k) (4). The respondent Commissioner originally relied on this statute, but appears later to have taken and held the position that the transaction was a gratuity, preventing the allowance of any deduction at all.

The facts were stipulated and disclosed the following: Prior to December, 1932,

petitioner owned some securities which she lent to her husband, William J. Fox. Fox was trading on the New York Stock Exchange through his brokers, Hilson & Neuberger; and prior to December 31, 1932, he had deposited these securities with the firm as collateral for his indebtedness to them on open account. On that day the Hilson firm liquidated and went out of business. Earlier in the month Fox had been told that this was going to happen and that the accounts of the Hilson firm would be taken over by another, Wertheim & Company, but that Wertheim would not assume his account without more collateral. Thereupon Fox tried to get petitioner to lend him more securities. She refused. But Fox pointed out that she would lose what she had already invested if she did not protect it. So she executed a guaranty to Wertheim on December 16, 1932. This, in the language of the Tax Court, "recited that in consideration of that company opening, or continuing, an account or accounts with or otherwise giving credit to Fox on such terms as that company might deem best, the petitioner unconditionally promised to pay the company on demand any debit balance or balances, and all losses, then, or which might thereafter be owing to the company by reason of said account or accounts. The instrument further provided that the guaranty therein was a continuing one and should cover the period of existence of said account or accounts, and that said account or accounts might be changed from time to time by the purchase or sale of securities or other property or by payments or deliveries of securities or other property to Fox without notice to the petitioner." At this time Fox owed his brokers $91,043.52; and the value of all securities in the account was only $71,633, of which $33,263 represented the value of those supplied by petitioner. So the Tax Court found that "the petitioner executed the guaranty because she did not want to lend any more securities to Fox and because she thought she would protect the securities she had theretofore loaned him."

In 1935, Fox transferred his brokerage account to another firm, Engel & Company, "for the purpose of saving interest"; and on August 16, 1935, petitioner executed to this firm another instrument of guaranty similar in its terms to the one previously given Wertheim. When the transfer to Engel was made, Fox's debit balance was $152,357.04. On October 19, 1937, Fox died, being then indebted to his brokers in the sum of $155,478.17. The sale of the securities pledged in the account brought in $14,212.03, thus reducing the indebtedness to Engel to $141,266.14. But Fox's estate was insolvent and his executors were discharged by the surrogate's court on July 31, 1940. Petitioner has therefore been forced to make payments to Engel and its successors yearly since 1937—usually in the sum of $15,000—which have totaled some $121,269.50. Only the payment of $15,000 in 1944 is here in issue.

For most of the payments made by petitioner this question could not be raised. Not until Congress changed the statute to make a deduction labeled a worthless "non-business debt" so much less advantageous to the taxpayer than one labeled a "loss" in a non-business transaction "for profit" did the need for making this narrow line of demarcation become insistent. True, it had been ruled that the categories were mutually exclusive; what was a bad debt could not be a loss and vice versa. Spring City Foundry Co. v. C. I. R., 292 U.S. 182, 54 S.Ct. 644, 78 L.Ed. 1200. When petitioner filed her 1944 return, she reported the $15,000 payment as a "miscellaneous" deduction, describing it as "Payment on guaranty —Wm. J. Fox brokerage a/c." At the hearing she claimed the deduction as a loss in a transaction entered into for profit, but was met with the contention that it was only a bad debt because on payment she would have a claim for reimbursement against her guarantor. Although this is the basis upon which a majority of the Tax Court found against her, she has steadily objected to it for its illusory character, since at the time of her payment her husband had been dead and his insolvent estate closed for several years. She argues that the court's theory of a debt against her husband's estate amounts to a subrogation forced upon her, contrary to the equitable spirit of the doctrine, to yield her an utter-

ly worthless claim and a very real tax liability.

 Although no authorities seem directly decisive, we think her argument persuasive. Of course we may say, as does respondent, that the taxpayer claiming the benefit of a deduction has the burden of proving it; but that does not mean that a statute limiting a deduction must be given a broad meaning beyond its terms. Here petitioner may have been acting gratuitously when she originally allowed her husband to pledge her securities. But we need not go back that far, for when in 1932 she refused further pledge and then reluctantly signed the guaranty (renewed in 1935) she was in fact securing the release of her securities. Whether she was well or ill advised in so doing, her act, on the Tax Court's finding as to her purpose, was a transaction entered into with the hope of profit or perhaps more specifically of cutting her losses. Cf. Weir v. C. I. R., 3 Cir., 109 F.2d 996, 997, certiorari denied 310 U.S. 637, 60 S.Ct. 1080, 84 L.Ed. 1406. Moreover, her then present intent would control, whatever had been her earlier purpose. Heiner v. Tindle, 276 U.S. 582, 48 S.Ct. 326, 72 L.Ed. 714; Evans v. Rothensies, 3 Cir., 114 F.2d 958, 962. Clearly, too, the transaction was not then one involving a bad debt, since she had not even made the payment which alone would give rise to a claim in her favor. Nor could payment ten years later create a debt out of something less than even the proverbial stone. It is utterly unrealistic to consider the payment as one made in any expectation of recovery over or of any legal claim for collection. Actually it was merely the fulfillment of her contractual obligation of the earlier date. The bad-debt provision thus had no direct application; only by straining the statutory language can we erect here a disembodied debt against an insolvent and long dead debtor.

 Respondent argues, however, that this guaranty cannot have been a contract entered into with any idea of profit, that rather it was at best only the hope of avoiding loss. He says: "But for all the record shows, a profit was impossible under this arrangement, just as it was impossible under the loan arrangement six months earli-

er. Furthermore, as an undertaking to protect the securities already loaned, it is difficult to believe that an ordinary prudent business man would have executed such a guaranty under the circumstances of this case unless impelled by some motive entirely disassociated from a profit motive. There is nothing in the record to even remotely suggest that the giving of this guaranty could prevent the loss of securities already loaned without causing the guarantor to sustain a corresponding or even greater loss as a direct result of the execution of the guaranty." We think this a misconstruction of the law on transactions "entered into for profit." As we said in Feine v. McGowan, 2 Cir., 188 F.2d 738, 740: "The Supreme Court has said that deductibility of losses under this section depends upon 'whether the taxpayer's motive in entering into the transaction was primarily profit.' Helvering v. National Grocery Co., 304 U.S. 282, 289, n. 5, 58 S.Ct. 932, 936, 82 L.Ed. 1346." In this connotation it would seem clear that the hope of monetary gain—as distinguished from some other consideration, such as family relationship or donative intent—is what is controlling and no sound distinction can be drawn as between cutting losses and showing a positive gain. From the low point her securities had reached at the time of the 1932 transaction, every step would seem upward, and hence within the meaning of "pecuniary gain" necessary to the profit motive. Goldsborough v. Burnet, 4 Cir., 46 F.2d 432, 433; Feine v. McGowan, supra.

 It is clear that the statute does not demand of the taxpayer that he or she have a moral certainty that profit will result; if it did few losses would be deductible. This is not a case where the transaction is clearly a losing one, entered upon because of an assumed moral obligation, Candler v. C. I. R., 5 Cir., 76 F.2d 548, or for reputation's sake, as designing a racing yacht, Paine v. C. I. R., 1 Cir., 102 F.2d 110, or where "under all the circumstances" known to the taxpayer at the time it is a "hopeless venture," Dresser v. United States, Ct.Cl., 55 F.2d 499, 510, certiorari denied 287 U.S. 635, 53 S.Ct. 85, 77 L.Ed. 550. No comparable intent is properly deducible from the salvag-

ing operation which this taxpayer contemplated.

■ We agree further with the dissenting judge below, who held that the payment cannot be translated into a debt which "compensated" for the payment within the meaning of I.R.C. § 23(e) where recourse to the original debtor's estate was now obviously out of the question. This conclusion actually accords with that reached by the Tax Court in cases involving debtors who have gone out of existence or been re-

organized so that a claim may no longer be enforced against them. Abraham Greenspon, 8 T.C. 431; Frank B. Ingersoll, 7 T.C. 34. And it does no violence to the theory that a debt might arise upon payment by a guarantor where the principal debtor remains still in existence. D. W. Pierce, 41 B.T.A. 1261; Daniel Gimbel, 36 B.T.A. 539. Deduction of the payment should therefore have been allowed in full.

The decision of the Tax Court is accordingly reversed.