BERT W. MARTIN AND ADA L. MARTIN, PETITIONERS V. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6561–66. Filed April 23, 1969.

*Richard E. Murphy, Jr.,* and *Warren C. Seieroe,* for the petitioners. *Richard G. Daly,* for the respondent.

OPINION

TIETJENS, *Judge:* The Commissioner determined a deficiency in petitioners' 1964 income tax of $6,793.66. We must decide whether a $425,000 loss claimed by petitioner Bert W. Martin in 1964 is deductible under section 165(c)(2) of the Internal Revenue Code of 1954[1] as a loss incurred in a transaction entered into for profit.

The facts have been fully stipulated and are so found. The stipulation and the exhibits attached thereto are incorporated herein by this reference.

Bert W. Martin (hereinafter referred to as Martin) and Ada L. Martin, husband and wife, resided at San Marino, Calif., at the time

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise specified.

they filed their petition herein. Their 1964 joint income tax return was filed with the district director of internal revenue, Los Angeles, Calif.

On June 1, 1958, Douglas S. Baird (hereinafter referred to as Baird) entered into a lease covering extensive lands near Lampoc, Calif. As lessee, Baird was granted the right to extract and process all kinds of stone, rock, sand, and gravel except diatomaceous earth and petroleum substances, from these lands. Baird and Martin became interested in a joint undertaking to exploit commercially the mineral deposits subject to Baird's lease. They believed at this time that there were large deposits of limestone which could be extracted, processed, and sold profitably for use as concrete aggregate. Other anticipated commercial uses for the product included use as riprap, building stone, and road-base material.

On June 2, 1958, Missile City Rock Corp. (hereinafter referred to as Missile City) was incorporated by Baird and others for the principal purpose of extracting, crushing, and screening rock and selling such gravel and other rock products for construction purposes.

Missile City's authorized capital at all times has consisted of 20,000 shares of $10 par value common stock. On December 2, 1958, Missile City issued 1,275 of its shares of common stock to Martin for cash at par. Baird was issued 1,225 shares. At all times thereafter, Missile City's outstanding stock has consisted of 2,500 shares of which Martin has owned 1,275, or 51 percent. On December 2, 1958, Martin was elected as a director and president of Missile City. He continued to occupy these positions at all material times.

On December 2, 1958, Baird sold his entire interest in the mineral lease to Missile City for $12,250. In early 1959, Missile City commenced to develop a quarry on the leased lands. A crushing plant and related facilities were installed. Starting-up costs by the close of March 1959, exceeded $213,000. These costs far exceeded the original estimates. The capital expenditures budget for the fiscal year ending May 31, 1959, exceeded $384,000. The cost of fixed assets plus the leasehold and development costs exceeded $600,000 by July 31, 1959. The plant did not become operative until September 1959. When quarrying operations commenced, it was discovered that the limestone deposits occurred in layered and lenslike deposits interspersed with other material rather than in solid formation. Extraction and processing costs exceeded the selling price of the products.

Prior to the development of quarrying and processing facilities Martin, as president of Missile City, was authorized to borrow up

to $400,000 on its behalf. Missile City's borrowing exceeded the original authorized amount:

| Missile City's taxable year or period | Amount borrowed |
|---|---|
| 6/2/58 to 5/31/59 | $350,000 |
| FYE 5/31/60 | 750,000 |
| FYE 5/31/61 | 500,000 |
| FYE 5/31/62 | 1,300,000 |
| FYE 5/31/63 | 250,000 |
| FYE 6/1/63 to 5/19/64 | 0 |
| Total | 3,150,000 |

The foregoing loans, from Northern Trust Co. of Chicago, Ill., were guaranteed by Martin. Martin's guaranty was secured by his pledge of sufficient readily marketable securities. All the loans were made with the knowledge and approval of the corporation.

By August 1963, Missile City has sustained large operating losses and had exhausted any hope of finding deposits which would support a profitable operation. Its assets were turned over to a receiver for the benefit of creditors who thereafter liquidated the assets and applied the entire net proceeds in partial satisfaction of creditors' claims, the final distribution to creditors being made in April 1964. None of these proceeds were paid to the Northern Trust Co. which had, with Martin's consent, subordinated its claim to the claims of other creditors. Missile City was dissolved in May of 1964. Thereafter, Martin paid $425,000 to the Northern Trust Co. in partial payment of his obligation as guarantor.

Martin guaranteed the bank loans to Missile City with the reasonable expectation that he would profit thereby through his 51 percent shareholder's interest in Missile City.

On his 1964 income tax return, Martin claimed a $425,000 deduction under section 165(c)(2) as a loss incurred in a transaction entered into for profit. The Commissioner determined Martin's $425,000 payment is not deductible under section 165(c)(2).

There is no claim that Martin's payment gives rise to a deduction either as a trade or business loss under section 165(c)(1) or as a business bad debt under section 166.

The Commissioner concedes that Martin is entitled to a short-term capital loss deduction. Consequently, the only question we must decide is whether Martin is entitled to a greater deduction under section 165(c)(2).

*Putnam* v. *Commissioner*, 352 U.S. 82 (1956), decided that a guarantor of a corporate note, who suffered a nonbusiness loss upon his payment in full of the guaranteed debt, did not sustain a loss deductible as one incurred in a transaction entered into for profit. The

Supreme Court reasoned that *instanter* upon such payment the guarantor became subrogated to the rights of the creditor in the original debt. The Court stated that the guarantor's loss, sustained because he was unable to recover from the debtor, was a loss attributable to the worthlessness of a debt, and held, at page 88, that such a loss "shall be regarded as a bad debt loss, deductible as such or not at all." While *Putnam* was decided under the 1939 Code, the statutory scheme therein for the treatment of losses persists in the 1954 Code, applicable in this case. Thus, if Martin's loss is "attributable to the worthlessness of a debt," it cannot be regarded as a loss incurred in a transaction entered into for profit; it must be deductible as a bad debt loss or not at all.

In the instant case, Martin made only partial payments as a guarantor of the original debt. Accordingly, if we correctly understand the applicable State law, the Northern Trust Co. retained its rights in the original debt; Martin did not succeed to those rights by subrogation. However, Martin's payments gave rise to a new debt in the form of an unconditional obligation on the part of Missile City to indemnify him in the amount of his payments. At the time the contract of guaranty was entered into, the law implied a promise on the part of Missile City to make Martin whole from any loss suffered on the guaranty. While this implied contract of indemnity created only a conditional obligation, Martin's subsequent payment made that obligation an unconditional one to reimburse him for a fixed sum of money. This was so independently of whether he might later have to pay more; it was money paid to Missile City's use for which it became liable at once. This was decided as early as *Shiman* v. *Commissioner*, 60 F.2d 65 (C.A. 2, 1932). That Martin's debt was subordinate to that owed the Northern Trust Co. does not affect its essential character as a debt.

The dissolution of Missile City prior to Martin's payments is without consequence with respect to our determination that a debt was created upon such payments. Before its dissolution, Missile City had undertaken, as a conditional obligation to Martin, to repay him any sums he might have to pay under his contract of guaranty on its behalf. It required no further consent on behalf of Missile City when the condition occurred and Missile City became bound unconditionally to pay Martin fixed sums of money. Too, dissolution did not terminate Missile City's existence for all purposes; at the time Martin made his payments, Missile City still existed for the purpose of being sued upon and discharging its obligations. Cal. Corp. Code sec. 5400 (West 1955). Further, on consideration of the statutory scheme concerning an individual's investment losses, the Supreme Court has held that the nonexistence of the debtor at the time of the guarantor's

payment to the creditor does not affect the fact that his loss receives short-term capital loss treatment. *Putnam, supra* at 93 fn. 21. Finally, we refuse to attach significance to the fact that Missile City was dissolved before Martin made his payments rather than afterwards. Otherwise a guarantor, who is also a majority stockholder, might determine the tax consequences that flow from a loss which, in most cases, is already fixed upon him. That would be the case here. Before its dissolution, Missile City was insolvent. With Martin's consent the Northern Trust Co. had subordinated its claims to the claims of the other creditors. It had only the guaranty to look to and was in possession of readily marketable securities of Martin's sufficient to assure that the whole loss would ultimately fall on his shoulders. Martin asks us to decide that corporate dissolution at this point, i.e., before the bank applied his collateral against the debt or otherwise received "payment" from him, would transform what would otherwise constitute a nonbusiness bad debt loss into a loss incurred in a transaction entered into for profit. We decline to do so.

Having determined that Martin's loss was "attributable to the worthlessness of a debt," we hold it cannot be deducted under section 165(c)(2).

The worthlessness of this debt at its inception is without consequence with regard to our holding that Martin's loss is not deductible under section 165. The argument is made that since the debt did not "become" worthless, the loss attributable thereto is not deductible under section 166, providing for a deduction for debts which "become" worthless. Since this loss is not deductible under section 166, the argument goes, it *must* be deductible under section 165. The Supreme Court disposed of this same argument in *Putnam* on two grounds. First, the debt in that case in fact "became" worthless and was held properly deductible as a bad debt loss. Second, the Court decided (p. 88) that even *"if it were true that the debt did not 'become' worthless, the debt nevertheless would not be regarded as an ordinary loss under * * * [sec. 165(c)(2)]. Spring City Co.* v. *Commissioner, supra."* (Emphasis supplied.) Similarly, whether Martin's debt "became" worthless is not relevant to the question whether his loss is deductible under section 165(c)(2); the debt nevertheless would not be regarded as a loss incurred in a transaction entered into for profit. *Putnam, supra* at 93 fn. 21.

In holding Martin is entitled to a short-term capital loss only we do not rely solely upon our finding that Martin's loss was "attributable to the worthlessness of a debt." We think *Putnam* was decided on the broader ground that payments in discharge of a guaranty are normally to be *treated as* bad debt losses. It was "upon this ground" that the Supreme Court apparently discredited *Fox* v. *Commissioner*, 190

F. 2d 101 (C.A. 2, 1951), reversing 14 T.C. 1160 (1950); *Putnam*, *supra* at 93 fn. 21. (This Court has heretofore treated *Putnam* as discrediting the Court of Appeals decision in *Fox*. *Albert Gersten*, 28 T.C. 756, 769 (1957).)

We refer to the following as further evidence that *Putnam* stands upon this broad ground. First, the Court cited, at page 86, the administrative and the judicial construction of the internal revenue laws which *"have always treated guarantors' losses as bad debt losses."* (Emphasis supplied.) Second, the Court stated, at page 86, that Congress "recently confirmed this treatment in the Internal Revenue Code of 1954 by providing that a payment by a noncorporate taxpayer in discharge of his obligation as guarantor of certain noncorporate obligations *'shall be treated as a debt.'* " (Emphasis supplied.) Third, *Eckert* v. *Burnet*, 283 U.S. 140 (1931), was distinguished, at page 89, on the ground that the statement in that case (to the effect that since the debt in that case was worthless when acquired there was nothing to charge off) *"did not imply a determination by this Court that the guarantor's loss was not to be treated as a bad debt."* (Emphasis supplied.) Finally, in support of its rationale that guarantor's losses are to be treated as bad debt losses, the Supreme Court stated, at pages 90–93:

> The objectives sought to be achieved by the Congress in providing short-term capital loss treatment for nonbusiness bad debts are also persuasive that § 23(k)(4) applies to a guarantor's nonbusiness debt losses. The section was part of the comprehensive tax program enacted by the Revenue Act of 1942 to increase the national revenue to further the prosecution of the great war in which we were then engaged.[16] It was also a means for minimizing the revenue losses attributable to the fraudulent practices of taxpayers who made to relatives and friends gifts disguised as loans.[17] Equally, however, the plan was suited to put nonbusiness investments in the form of loans on a footing with other nonbusiness investments. The proposal originated with the Treasury Department, whose spokesman championed it as a means "to insure a fairer reflection of taxable income,"[18] and the House Ways and Means Committee Report stated that the objective was "to remove existing inequities and to improve the procedure through which bad-debt deductions are taken."[19] We may consider Putnam's case in the light of these revealed purposes. His venture into the publishing field was an investment apart from his law practice. The loss he sustained when his stock became worthless, as well as the losses from the worthlessness of the loans he made directly to the corporation, would receive capital loss treatment; the 1939 Code so provides as to nonbusiness losses both from worthless stock investments and from loans to a corporation, whether or not the loans are evidenced by a security.[20] It is clearly a "fairer reflection" of Putnam's 1948 taxable income to treat the instant loss similarly. There is no real or economic difference between the loss of an investment made in the form of a direct loan to a corporation and one made indirectly in the form of a guaranteed bank loan. The tax consequences should in all reason be the same, and are accomplished by § 23(k)(4).[21] [Footnotes omitted.]

These considerations apply with equal force to the case we have before us.

We hold Martin's loss is deductible as a short-term capital loss. To distinguish this case from *Putnam* on the ground that Martin was not subrogated to the Northern Trust Co.'s debt would be to decide, in effect, that the guarantor who makes full payment of the debt is limited to a short-term capital loss, while the same guarantor who makes but part payment is accorded a fully deductible loss under section 165(c) (2). This anomaly is repellent, and nowhere does *Putnam* suggest such a distinction. *Putnam*'s discussion of subrogation relates only to the question of whether the debt in that case "became" worthless so as to meet the statutory requirements for the deduction of worthless debts; that discussion in no way relates to the entirely different question of *nondeductibility* of guarantors' losses under section 165(c) (2). It is the latter question only which is in dispute here.

In deciding that Martin is entitled to a short-term capital loss only, we reaffirm this Court's holding in *Agnes I. Fox*, 14 T.C. 1160 (1950), revd. 190 F. 2d 101 (C.A. 2, 1951). In that case, we decided that a guarantor's partial payment of the guaranteed debt 7 years after the death of the primary obligor, after the closing of his estate and after the discharge of his executors, gave rise to a bad debt loss. We think the correctness of our decision in *Fox* was affirmed in *Putnam* when the Supreme Court stated that the decision of the Court of Appeals, reversing this Court, was incorrectly decided. *Putnam, supra* at 93 fn. 21.

In passing it might be helpful to comment on some cases which seemingly support petitioner's argument that the amounts which he paid are deductible as losses incurred in a transaction entered into for profit.

See *J. J. Shea*, 36 T.C. 577, affd. 327 F. 2d 1002, where, in distinguishing *Putnam*, we said at page 583:

In the instant case * * * the petitioner, at the time he made the payments * * * and was released from his liability on his guaranty, had neither paid nor been called upon to pay any amount under his guaranty, * * *. The petitioner therefore under his guaranty had made no payment of any indebtedness * * * which could give rise to any bad debt owing to him * * *

And see *D. J. Condit*, 40 T.C. 24, affd. 333 F. 2d 585, where, in holding *Putnam* not to be controlling we said at page 29: "The amounts in dispute here were not payments made in satisfaction of petitioner's liability as guarantor * * *."

And in *Santa Anita Consolidated, Inc.*, 50 T.C. 536, the Court stated at page 559: "Rather, the genesis of the payment was the release from contingent liability under the guaranty." In other words, the payment was not on the guaranty.

The case that gives us more trouble is *Eugene H. Rietzke*, 40 T.C. 443, which contains language indicating that unless there is complete or partial subrogation, under State statutes, there is no debt which

can be deducted. We do not think this language was necessary to the decision in the case which, like those noted above, involved a settlement of other claims in addition to the guaranty. We think *Rietzke* is distinguishable from the case at bar on that ground. Something more than a simple payment on a guaranty was involved in the settlement of conflicting claims pursuant to which settlement the payment sought to be deducted was made.

In line with *Shiman, supra,* we think what we have here is a debt, is a debt, is a debt and is deductible, if at all as a debt and not something else.

Reviewed by the Court.

*Decision will be entered for the Commissioner.*

---

FEATHERSTON, *J.*, concurring: Accepting the correctness of the majority's premise that under applicable State law Martin's loss was attributable to a debt that became worthless, I agree with the result. However, with due deference, I do not read *Putnam v. Commissioner*, 352 U.S. 82 (1956), as having been "decided on the broader ground that payments in discharge of a guaranty are normally to be *treated as* bad debt losses."

Section 166(a) allows a deduction for "any debt which becomes worthless within the taxable year." If there is no "debt," the section, by its terms, does not apply. In *Putnam*, the Court found that the guarantor acquired the requisite debt by operation of the State law of subrogation. In my view, *Putnam* does not *treat* the payment of the obligation of the guarantor as the deductible bad debt, but rather holds that, as a result of the payment, the guarantor acquired a debt which became worthless in his hands and thus deductible. If the guarantor does not acquire a debt, I do not think a guarantor's loss is deductible under section 166.

DRENNEN, RAUM, WITHEY, FORRESTER, TANNENWALD, and STERRETT, *JJ.*, agree with this concurring opinion.