W. L. HARDEE AND ELNORA HARDEE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hardee v. Commissioner
Docket No. 1567-73.
United States Tax Court
T.C. Memo 1975-129; 1975 Tax Ct. Memo LEXIS 243; 34 T.C.M. (CCH) 608; T.C.M. (RIA) 750129; May 7, 1975, Filed *244 Thomas C. O'Bannon, for the petitioners. Donald W. Williamson, Jr., for the respondent. TIETJENS
MEMORANDUM OPINION TIETJENS, Judge: The Commissioner determined deficiencies of $7,773.12, $8,805.31, and $8,911.84 in the Federal income taxes of petitioners for their taxable years 1968, 1969, and 1970, respectively. Petitioners have made certain concessions so that the only question remaining for decision is whether certain payments made in connection with the obligation of W. L. Hardee (hereafter petitioner) as guarantor can be deducted as losses on a transaction entered into for profit under section 165(c) (2), I.R.C. 1954, [1] or must be treated as payment of a nonbusiness bad debt under section 166(d). This case was fully stipulated pursuant to Rule 122, Tax Court Rules of Practice and Procedure. The facts which we deem necessary for decision will be referred to below. Petitioners, husband and wife, resided in Brownsville, Texas, at the time of the filing of their petition herein. They filed joint income tax returns for 1968, 1969, and 1970 with the *245 Internal Revenue Service Center, Chamblee, Georgia, which reflected their address then as being Jacksonville, Florida. Prime Quality Foods, Inc. (Prime Foods), was organized on August 10, 1965, under the laws of Texas to engage in the business of buying, processing, and selling frozen shrimp and shrimp products. Prime Foods' authorized capital stock at the time of its organization was 1,000 shares at $100 par, of which 300 shares were issued and paid for as follows: petitioner, 150 shares; Henry W. Walsh, 149 shares; Benjamin Hardy, attorney, 1 share. The ownership of the stock did not change until December 3, 1966, when petitioner obtained one additional share of stock from Walsh. Petitioner held this stock interest until he surrendered his entire stock interest in Prime Foods in the spring of 1968 to a bank involved in Prime Foods' efforts to obtain a loan from or through the Small Business Administration (hereafter SBA). Walsh held the office of president and general manager of Prime Foods; petitioner held the office of treasurer; and Benjamin Hardy held the office of secretary. Petitioner invested in Prime Foods and undertook the Prime Foods venture with the expectation that *246 he would profit or gain thereby through his stock ownership in Prime Foods. After operating unsuccessfully, Prime Foods ceased processing shrimp during March 1967 although it still had some $250,000 to $300,000 of processed shrimp inventory in bonded warehouses ready for sale. This inventory carried Prime Foods for a short while. On June 27, 1967, three creditors of Prime Foods filed an involuntary petition in bankruptcy against Prime Foods, which petition was joined in later by three more creditors. The bankruptcy proceeding, commenced on June 27, 1967, evolved into an arrangement proceeding under Chapter XI of the Bankruptcy Act, with Prime Foods' plan of arrangement being affirmed by order of the Bankruptcy Court filed on April 8, 1968. Prime Foods applied for a loan from the SBA in August 1967. The SBA's loan was not disbursed to Prime Foods until August 21, 1968, having been approved May 29, 1968. The loan was initially declined on October 16, 1967, but was reconsidered and finally approved. The loan went to liquidation status on July 23, 1970, and all collateral was sold by the SBA by summary process on August 18, 1970. Prime Foods had ceased conducting business prior to *247 that date. On june 27, 1967, the day the involuntary petition in bankruptcy was filed, petitioner executed with the First National Bank of Harlingen, Texas (hereafter First National), a guaranty agreement whereby he guaranteed the payment of any and all debts of Prime Foods to the bank up to the total amount of $85,000. Petitioner had had for at least a year an understanding with the bank that he guaranteed payment of loans made by the bank to Prime Foods. On July 19, 1968, when Prime Foods was in arrears on loans totaling $68,601.69, First National called upon petitioner to honor his guaranty of the loan account. There was no written demand, just an oral demand, which was all that was required. The debt of $68,601.69 consisted of the balance due on Prime Foods' obligations of $61,947.43, interest of $3,907.98, and an overdraft by Prime Foods of $2,746.28. After reducing this debt by an $867.57 payment on an account receivable owed to Prime Foods, which was paid to the bank, petitioner sent a letter to the bank on July 22, 1968, in which he enclosed a 7 percent promissory note for $67,734.13 due on January 16, 1969, and advised the bank that the note was to secure his release from *248 his guaranty of June 27, 1967. The letter reads in pertinent part as follows: This Note is delivered to you conditionally on the basis that you agree to accept this Note not in payment of my obligation to guarantee advances to Prime Quality Foods, Inc. but is accepted by the Bank as consideration to secure my release from any and all obligations which I may have to make payment under said Guaranty. First National indicated its agreement to the condition on which the note was delivered by endorsing petitioner's letter. The bank agreed to accept petitioner's note for the balance of Prime Foods' indebtedness due at that time. Petitioner's note operated from the standpoint of the bank to discharge Prime Foods from all outstanding obligations it had to the bank at the time the note was given, particularly the loans which petitioner had guaranteed. The bank did not thereafter attempt to collect any further amounts from Prime Foods by reason of Prime Foods' original obligation to the bank, and the bank had no further interest in Prime Foods thereafter and made no further loans to it. At the time the bank called upon petitioner to honor his guaranty, Prime Foods was insolvent. Prime *249 Foods subsequently made five payments on petitioner's note to First National as a result of sale of the balance of its shrimp inventory. These payments by Prime Foods on the note were made between August 1, 1968, and October 10, 1968, and reduced the principal balance of the note to $50,951.49. Then, on December 20, 1968, petitioner paid $10,000 on the principal of his note and interest of $1,705.83, leaving a balance of $40,951.49 on the note which was renewed for six months with a new due date of June 20, 1969. On June 30, 1969, petitioner paid $5,000 on the principal and interest of $1,481.10 and renewed the balance of $35,951.49 for six months due December 26, 1969. On December 18, 1969, petitioner paid $5,000 on the principal and interest of $1,288.26 and renewed the balance of $30,951.49 due on June 18, 1970. On June 17, 1970, petitioner paid $5,000 on the principal and interest of $1,160.66 and renewed the balance of $25,951.49 for six months due December 18, 1970. On December 24, 1970, petitioner paid $5,000 principal and interest of $973.21 and renewed the balance of $20,951.49 for six months to June 18, 1971. On May 26, 1971, petitioner paid the full amount of the last note *250 of $20,951.49, plus interest of $688.88. On their 1968, 1969, and 1970 tax returns, petitioners claimed the respective amounts of $10,000, $9,191.87 and $11,011.20 as "indemnity losses." These amounts represented the payments he made to First National in 1968, 1969 and 1970, less a collection of $808.13 he received from Prime Foods in 1969, plus an additional $1,011.20 debt of Prime Foods petitioner claimed in 1970. In addition, petitioner claimed the amounts of $1,705.83, $2,769.36, and $2,133.87 he paid to the bank as interest deductions under section 163 on his returns for 1968, 1969 and 1970, respectively. The Commissioner determined that the amounts claimed as indemnity losses and as interest deductions in 1968, 1969 and 1970 represented losses from nonbusiness bad debts which were deductible only as short-term capital losses under section 166(d). Petitioners contend that these amounts represent losses deductible under section 165(c)(2). [2]
*251 It is well established that payments made by a taxpayer in satisfaction of his obligation as guarantor of corporate debts are deductible only under section 166 and cannot be deducted under section 165. Putnam v. Commissioner,352 U.S. 82 (1956); Stratmore v. United States,420 F.2d 461 (3d Cir. 1970), cert. denied 398 U.S. 951 (1970); United States v. Hoffman,423 F.2d 1217 (9th Cir. 1970); Bert W. Martin,52 T.C. 140 (1969), affd. per curiam 424 F.2d 1368 (9th Cir. 1970), cert. denied 400 U.S. 902 (1970). [3] It is also well established that common law concepts of subrogation and distinctions between guarantors and indemnitors are not significant in applying the rule of Putnam( United States v. Hoffman,supra;Stratmore v. United States,supra; and Bert W. Martin,supra), for that rule is intended, in a general way, to "protect the statutory scheme for a common tax treatment of all losses suffered by a corporate stockholder in providing his corporation with financing." United States v. Hoffman,supra, at 1218. *252 Petitioners would have us place controlling emphasis on the letter in which petitioner required First National to accept his note "as consideration to secure * * * [his] release" rather than as "payment of * * * [his] obligation." Although, because this case is fully stipulated, the evidence is placed before us without oral testimony, we have concluded from the stipulation and documents that petitioner's note in fact fulfilled petitioner's obligation and resulted from the bank's demand that petitioner honor his guaranty. We have concluded that petitioner's stating that his note was offered to secure a "release" is irrelevant and that, in substance, petitioner's activities are not distinguishable from those of the taxpayer in Putnam v. Commissioner.In short, we attach little significance to the language or form in which petitioner satisfied his obligation. Gregory v. Helvering,293 U.S. 465 (1935). Cf. Victor H. Heyn,39 T.C. 719 (1963). Putnam, in which the Supreme Court was concerned with the objectives of a statutory scheme, does not support distinctions *253 based on the form in which a guarantor fulfills his obligations. Petitioner cites Mozelle Rushing,58 T.C. 996 (1972), Eugene H. Rietzke,40 T.C. 443 (1963), and J. J. Shea,36 T.C. 577 (1961), affd. per curiam 327 F.2d 1002 (5th Cir. 1964), all of which involve facts significantly different from those involved herein. Each of those cases involved more than a simple payment in fulfillment of a guaranty. Decision will be entered for the respondent.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise stated.↩
2. Petitioners do not claim that the payments were deductible as business losses under section 165(c) (1) or as business bad debts under section 166, and petitioners concede that, if they are not entitled to ordinary losses on the payments to the bank, then the payments are allowable only as short-term capital losses as determined by the Commissioner. We also note that, in their briefs, the petitioners do not claim that any amounts are deductible as interest under section 163. In short, we are asked to decide only whether petitioner's payments may be deducted under section 165↩ rather than section 166.
3. Cf. Fred W. Marquart,T.C. Memo. 1975-117↩.