SAMUEL S. and EILEEN S. CHO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Cho v. Commissioner
Docket No. 5840-74.
United States Tax Court
T.C. Memo 1976-318; 1976 Tax Ct. Memo LEXIS 85; 35 T.C.M. (CCH) 1442; T.C.M. (RIA) 760318; October 12, 1976, Filed Ton Seek Pai, for the petitioners. David R. Brennan, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined the following deficiencies and additions to tax in petitioners' Federal income tax: Additions to Tax
Year
Deficiency
Sec. 6651 (a) [1]
Sec. 6653 (a) n1a
1966
1,890.82
472.21
94.24
1967
1,081.51
54.47
1968
1,366.22
68.26
1969
3,590.62
The issues for decision are: (1) Whether payments made by petitioner Samuel S. Cho in 1968 through 1969 in discharge of his obligation as guarantor on certain corporate debts *87 were business or nonbusiness bad debts or were ordinary and necessary business expenses? (2) Whether petitioner met the substantiation requirements of section 274 in relation to certain business expenses in 1968? FINDINGS OF FACT Some of the facts have been stipulated and are so found. At the time petitioners filed their petition, they resided in Honolulu, Hawaii. Eileen S. Cho is a party solely by virtue of having filed a joint income tax return with her husband, and Samuel S. Cho will be referred to herein as petitioner. After having served in the Air Force during the Korean War, petitioner set up his own practice as a certified public accountant in Honolulu, Hawaii. He drew his clients mainly from the Chinese-American community.He also taught accounting and taxation at the University of Hawaii. Sometime in 1960 petitioner was diagnosed as having cancer of the larynx. He gradually lost the use of his voice and was forced to resign from his university post and substantially reduce his accounting practice. During the following eighteen month period, petitioner underwent seven operations resulting in the removal of his larynx. By some point in 1962, petitioner *88 could communicate only through the use of pencil and paper. He concluded he could no longer function effectively full time as a C.P.A. Petitioner responded to this misfortune by seeking a new line of business in which the ability to speak would be less important. One of his clients, a Mr. Patterson, operated a wood products company and was experienced in the purchasing of timber in the Fiji Islands. Petitioner and Patterson decided to form a company to cut and export Fijian timber, with Patterson supplying the lumbering expertise and petitioner supplying managerial and administrative skills. Petitioner and Patterson incorporated their enterprise under the laws of the State of Hawaii on May 2, 1962. The company's name was originally Pacific Woods Corporation, but later was changed to Pacwood International, Inc. ("Pacwood"). Petitioner was president and chairman of the Board of Directors and ran the company's day-to-day affairs. He operated Pacwood from his residence, which was also the location from which he handled what remained of his accounting practice. After six months of operation, relations between Patterson and petitioner grew strained and Patterson left Pacwood. *89 Petitioner obtained operating capital for the new company by a variety of methods. Petitioner invested significant amounts of his own funds into Pacwood. In 1962 he put in $21,000, in 1963 an additional $13,000, and in 1964 a further $16,000. By the end of 1964 he had invested a total of $50,000 in Pacwood's common stock and owned approximately 25 percent of the total outstanding common stock. He also sold stock to his accounting clients. Among his clients who purchased stock were Herbert Y.C. Choy, an attorney who had previously handled petitioner's legal affairs (now a judge on the U.S. Court of Appeals for the Ninth Circuit), Doctor E. Wonsik You, Robert C.H. Chung, and Doctor H.T. Wong. Neither petitioner's purchases nor the other sales of common stock, which together totaled $200,000 by October 1964, generated enough funds to meet Pacwood's requirements. From the beginning of its existence Pacwood sought to borrow additional funds from various Hawaiian banks and finance companies. These lenders agreed to advance funds only after petitioner, Choy, You, Chung, and Wong each agreed to act as co-guarantors of the loans. At the time the five entered into the guaranties, *90 they understood among themselves that petitioner alone would be responsible for paying off all guaranties. During 1962 and 1963, petitioner's determined efforts to learn to speak by the esophageal method began to succeed. As his ability to communicate improved, he gradually increased his accounting practice. For example, in 1963 he attracted the business of a successful stock broker, Willard M. P. Wong. The time demands of Pacwood, however, had caused some of his accounting clients to receive inadequate service, including William Chung, the brother of Robert C. H. Chung. Petitioner did not decide to devote the bulk of his time to his accounting practice until some time in 1963 or 1964. Despite petitioner's efforts to generate capital, Pacwood did not prove successful. The event precipitating Pacwood's decline was the failure in 1964 of Pacwood's supplier in Fiji to provide it with logs meeting the specifications of Pacwood's customers, causing those customers to reject the logs. Though Pacwood began legal action against the supplier, the suit proved futile. In addition, a great flood in Fiji destroyed Pacwood's logging roads and much of its equipment. To secure the funds *91 to rebuild the logging roads and to satisfy Pacwood's continuing needs for working capital, Pacwood's Board of Directors first tried to assess the shareholders to raise additional money. Shareholder response, however, was negative. As an alternate measure, in December 1963 the corporation issued shares of preferred stock. Although $52,000 worth of preferred stock was eventually sold, about one-half being sold to clients of petitioner's accounting practice, Pacwood's capital problems remained unsolved. By December 1965, Pacwood had overdue loans of more than $114,000, and the guarantors of the loans were forced to begin repaying the banks. A final attempt by Pacwood's Board at assessing its shareholders failed. With no options remaining, Pacwood's Board of Directors voted on January 4, 1966 to liquidate the assets of the company. On the same day, the five guarantors formed a joint venture under which they agreed to liquidate Pacwood's assets and satisfy creditors to the extent possible. The shareholders ratified this action on December 1, 1967. Pacwood still possessed some machinery in Fiji, some of which had been damaged in the flood. Pacwood was unable to sell or salvage *92 any of the machinery, which had only minimal value by 1965. Pacwood's major liabilities consisted of loans outstanding of over $114,000 and additional debts of approximately $10,000. The burden of repaying the various lenders fell on the guarantors. Their payments from 1965 to 1969 were as follows: Guarantors
1965
1966
1967
1968
1969
Total
Samuel S.
$10,362.67
$ 6,725.39
$ 5,702.34
$7,500.50
$30,290.90
Cho
Herbert Y.
2,717.58
6,560.36
4,590.68
984.48
14,853.10
C. Choy
Dr. Robert
$784.64
896.08
426.93
10,575.00
12,682.65
C. H. Chung
Dr. E.
3,178.58
3,838.40
5,850.00
12,866.98
Wonsik You
TOTAL
$784.64
$17,154.91
$17,551.08
$26,718.02
$8,484.98
$70,693.63 The fifth guarantor, Dr. H. T. Wong, made no payments. Beginning in 1970 petitioner shouldered the entire burden of repaying the lenders. As early as 1965, the other guarantors had told petitioner to undertake to repay the loans by himself in accordance with their initial understanding that petitioner would pay all guaranties the five made on Pacwood's behalf. Petitioner's personal assets, however, were insufficient. His only assets were his library, *93 several adding machines, and his home in which he had an equity of only $3,000. Petitioner was very concerned about his relationship with the other guarantors. During the period when Pacwood was declining and his speech improving, he had successfully begun to rebuild his accounting practice, relying heavily upon the patronage of the other guarantors. His gross billings from his accounting practice showed an increase from $39,900 in 1964 to $66,851.90 in 1969. Of these amounts the four guarantors had provided 37.3 percent in 1964, 36.7 percent in 1965, and 52.3 percent in 1966. Petitioner thought that if he did not do all he could to discharge the entire guaranty obligation, the other guarantors would stop using his accounting services. However, the best arrangement that petitioner could immediately offer the other guarantors was to do their accounting for a reduced fee. This did not satisfy Dr. W. Wonsik You, who began using a different accountant in 1968. Petitioner lost another guarantor, Robert Chung, several years thereafter, due to similar dissatisfaction. Other accounting clients told petitioner that if petitioner did not exert his best efforts to repay the guarantors *94 they would stop using his services. Petitioner briefly considered the possibility of bankruptcy, but rejected that option because of the almost certain loss of accounting business it would entail. During 1968, petitioner reconstructed the records of a partnership whose three partners had died. Since petitioner shared his office with a real estate broker, the parties involved met at a restaurant or cocktail lounge. Meetings occurred twice a week for over two years. Petitioner paid the expenses of every third meeting, which averaged $30 a meeting. Petitioner on his tax return for 1966 reported an estimated loss from logging operations of $10,000. On his tax returns for 1967, 1968 and 1969, petitioner deducted $4,186.70, $2,683.74 and $11,684.48, respectively, as ordinary losses from the Pacwood Liquidation Joint Venture. On his return for 1968 he deducted $2,400 for entertainment expenses related to the reconstruction of the partnership records. Respondent disallowed all of the above. OPINION Issue 1.Guaranty Payments.
Having totally lost the use of his voice, petitioner reduced his accounting practice and organized and operated a lumber exporting corporation. *95 To obtain outside financing, petitioner persuaded four shareholders to join him in guaranteeing repayment of funds which the corporation borrowed. Pacwood suffered financial difficulties and was unable t repay these obligations, and as a consequence the guarantors, including petitioner, were forced to make payments on their guaranties during the years in issue. Petitioner contends that his payments on these guaranties during the years in issue are deductible as ordinary and necessary business expenses under section 162. Respondent asserts that section 166 controls and that petitioner is entitled only to a nonbusiness bad debt. We agree with respondent. We have found as facts that petitioner entered into guaranty agreements with several Hawaiian banks and finance companies, which were conditions precedent t these lenders advancing money to Pacwood; and that Pacwood was subsequently unable to meet its obligation to repay the loans to the various lenders, causing petitioner and three of the other guarantors to begin making good on their guaranty agreements.
It is well settled that *96 if section 166 applies, its provisions are exclusive, thereby denying petitioner any benefits under section 162. M. Seth Horne,59 T.C. 319, 336 (1972), affd. 523 F. 2d 1363 (9th Cir. 1975); see Oddee Smith,55 T.C. 260, 267 (1970), vacated and remanded 457 F. 2d 797 (5th Cir. 1972) (for reconsideration in light of United States v. Generes,405 U.S. 93 (1972)), opinion on remand 60 T.C. 316 (1973); W. D. Roussel,37 T.C. 235, 243 (1961). We conclude below that section 166 applies.
Section 166(a) allows a deduction for "any debt which becomes worthless within the taxable year." In Putnam v. Commissioner,352 U.S. 82 (1956), the Supreme Court held that payment by a guarantor creates a debt against the principal obligor by operation of the state law of subrogation. This is true even when the principal obligor is insolvent or nonexistent at the time the guaranty is paid. We have in the past looked to the state law of subrogation to determine the existence *97 of a debt. Putnam v. Commissioner,352 U.S. 82, 85 (1956); Santa Anita Consolidated, Inc.,50 T.C. 536, 559 (1968); Eugene H. Rietzke,40 T.C. 443, 451 (1963). Cf. Robert E. Gillespie,54 T.C. 1025, 1031 (1970), affd. F. 2d (9th Cir. 1972, 30 A.F.T.R. 2d 72-5574, 72-2U.S.T.C. par. 9742); Bert W. Martin,52 T.C. 140, 143 (1969), affd. percuriam424 F. 2d 1368 (9th Cir. 1970). However, as we have recently stated in Winston Stoody,66 T.C. 710 (1976), the Ninth Circuit has held that guarantor losses and indemnitor payments will be treated as a bad debt, even though the guarantor or indemnitor is not subrogated to the rights of the creditor. Horne v. Commissioner,523 F. 2d 1363 (9th Cir. 1975), affg. 59 T.C. 319 (1972); United States v. Hoffman,423 F. 2d 1217 (9th Cir. 1970) (relying on Stratmore v. Commissioner,420 F. 2d 461, 465 (3d Cir. 1970), cert. denied 398 U.S. 951 (1970). These decisions stand for the proposition that losses *98 arising from all forms of corporate debt financing, whether the taxpayer makes a direct loan or guarantees or indemnifies a third party loan, should be treated similarly for tax purposes. Under the rule of Jack E. Golsen,54 T.C. 742 (1970), affd. 445 F. 2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971), we view these decisions as controlling and hold that petitioner's losses are debts under section 166. In order to be deductible, the principal debt must have been worthless during the years in issue. Respondent has not questioned the worthlessness of Pacwood's debt, and therefore we conclude that the debt was un-collectible at the time petitioner began payment on the guaranties. Finally we must decide whether the debt in issue was a business or nonbusiness debt under subsection 166(d). If the debt is a worthless business debt, petitioner is entitled to deduct the entire amount. If the debt is a nonbusiness one, petitioner is entitled only to a short term capital loss. Section 166(d)(2) provides that a "nonbusiness debt" is a *99 debt other than (1) a debt created or acquired in connection with a trade or business of the taxpayer, or (2) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. Whether a debt is a business or nonbusiness one is a question of fact. Section 1.166-5(b), Income Tax Regs. The regulations further state that the business relationship to the debt must be proximate for the bad debt to be treated as a business bad debt. Section 1.166-5(b), Income Tax Regs.
The statute and the regulations do not tell us at what point in time we should look to determine proximity in a guaranty context. The courts have filled this gap by holding that the time to determine proximity is the time when petitioner entered into his guarantee agreements. See United States v. Generes,405 U.S. 93, 100-101 (1972); cf. Stratmore v. Commissioner,420 F. 2d 461, 463 (3d Cir. 1970), cert. denied 398 U.S. 951 (1970); Niblock v. Commissioner,417 F. 2d 1185, 1187-1188 (7th Cir. 1969), affg. a Memorandum Opinion of this Court; W. D. Roussel,37 T.C. 235, 242-243 (1961); *100 Revenue Ruling 71-561, 1971-2 C.B. 128. When petitioner entered into the guaranty agreements he was in two businesses: he was in the business of being a corporate executive of Pacwood and he was carrying on an accounting practice. The question is whether, viewed in relation to these business activities, the bad debt fell within either of the two categories of business bad debts set forth in section 166(d)(2) cited above. We conclude it did not. Petitioner does not contend that he entered into the guaranty agreements to protect his employment wit Pacwood, and concedes that they were not entered into in connection with his accounting practice. At the time petitioner entered into the guaranties of Pacwood's debts he did so to protect his investment in Pacwood, to keep the company going. However, he claims that when the time came to pay on the guaranties, he did so to protect his accounting business and keep as clients his co-guarantors. Basically, however, having executed the guaranty agreements, when petitioner paid the guaranties he had little or no choice. He claims that he had a choice not to honor his guaranty when the primary debtor defaulted because he *101 could have elected to declare bankruptcy, and that he did not choose this route because to do so would have antagonized his co-guarantors and lost their accounting business. However, even if we assume that he could have obtained a discharge in bankruptcy and thereby avoided honoring the guaranty, both section 1.166-5(b), Income Tax Regs. , and United States v. Generes,405 U.S. 93 (1972), state that the business relationship to the debt must be proximate for the bad debt to be treated as a business bad debt. The difficulty with petitioner's bankruptcy argument is the remoteness of the business motivation from the debt itself. The debt arose because petitioner honored his guaranties. The guaranties were entered into for reasons extraneous to petitioner's businesses. The guaranty was the proximate cause of the debt. Avoidance of bankruptcy was clearly a remote, collateral matter within the Generes formulation and section 1.166-5(b), Income Tax Regs. Under all the circumstances, the predominant reason was nonbusiness; avoiding bankruptcy was perhaps "material", but this is insufficient. As the *102 First Circuit said in French v. United States,487 F. 2d 1246, 1248 (1973), in a not dissimilar case: Unless the debt was a business debt when created--a characterization we will answer later--taxpayer's contention must be that since he had to pay the debt to the finance company to maintain his personal credit standing, it is to be regarded as a business debt under subsection B [of section 166(d)(2)]. But in talking about motive for the payment, instead of for the incurrence of the debt, taxpayer is speaking of an event as to which he admittedly had no choice. [2]/ To say that a payment which is unavoidable has a "dominant [business] motive" and hence is to be regarded as a business debt because of collateral consequences of nonpayment is to confuse substance with tangential result. The reality of the situation is that the loss from the worthlessness of the debt was incurred as a result of the act of the defendant *103 in 1961 in undertaking the obligation. The business or nonbusiness quality of the loss was not changed because taxpayer in 1964 decided to fulfill the already vested obligation voluntarily. If taxpayer did not make the guarantee originally as a business obligation, it did not become such by the mere fact that his paying in cash, instead of by distraint of a lawsuit, may have avoided business complications. The fallacy of emphasizing the circumstances of payment instead of those surrounding the incurring of the loss may be illustrated in simple terms by considering an individual whose business success depends on his personal credit rating, and who says that since nonpayment of his personal bills would injure his credit, paying them is a business expense. However attractive, this is not a viable proposition. Issue 2. Business Expenses.
In 1968 petitioner incurred certain entertainment expenses at meetings held in restaurants or cocktail lounges to reconstruct the records of a partnership. Petitioner, however, has provided no specific evidence concerning the time, place, and amount of each entertainment expense. He has only offered evidence that, in general, the meetings *104 occurred twice a week and that he paid the expenses of every third meeting, averaging $30 a time. Section 274(d), however, requires precise details concerning time, place and amount. Section 1.274-5(b)(1) and (b)(3), Income Tax Regs.; C. James Mathews,61 T.C. 12, 25-27 (1973), reversed on another issue 520 F. 2d 323 (5th Cir. 1975), cert. denied U.S. (Mar. 22, 1976) Decision will be entered for the respondent . Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue. n1a Petitioner did not contest the correctness of the additions to tax under either section 6651(a) or section 6653(a). He made no mention of them in his petition, at trial, or in his briefs. We therefore conclude he has conceded all additions to tax.↩
2. The "forced to honor" language previously quoted from his brief paraphrased taxpayer's testimony, "I had to cover it, anyway.I had no choice."↩