BARNHART-MORROW CONSOLIDATED, PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 105859. Promulgated August 20, 1942.

*B. W. Burkhead, Esq.,* and *Harold C. Morton, Esq.,* for the petitioner.

*E. A. Tonjes, Esq.,* for the respondent.

596

598

OPINION.

*Bad Debt Issue.*

DISNEY: The respondent disallowed the item of $16,500.10 as a bad debt deduction upon the ground that the debt was not ascertained

to be worthless and charged off during the taxable year. The substance of respondent's argument upon brief is that the promise of C. C. Julian ceased to have any value in 1934, when he died leaving no estate, and that the "loss", if any, was sustained in that year.

It was stipulated that the amount was charged off in 1936, leaving for decision only the question of whether the debt was ascertained to be worthless in the same year. Both parties refer to the undertaking of C. C. Julian as a contract of indemnity and we will assume that it was such an agreement. Under it the indemnitor obligated himself to reimburse petitioner in the event petitioner was compelled to pay to another any amount paid to him or his agent under his claim of right to receive a portion of the proceeds of production of Well No. 16. This promise did not ripen into a claim against the indemnitor until 1936, when the courts of California decided that J. A. Smith was the owner of the interest under which C. C. Julian's nominee had received the sum in question. *Howell* v. *Commissioner*, 69 Fed. (2d) 447. Thus there was not at any time prior to 1936 a debt against C. C. Julian to ascertain to be worthless. When it did come into existence, it was worthless and petitioner so ascertained it. Then, for the first time, there was a debt to collect, and if ascertained to be worthless, to charge off as uncollectible.

Respondent cites no authority for his statement that the obligation of C. C. Julian was discharged by his death. We find none. It was not a personal covenant, incapable of being performed by any other person. On the contrary, his obligation was one which survived him and for which his estate was liable. *Elliott* v. *Garvin*, 166 Fed. 278; *Brownfield* v. *Holland*, 63 Wash. 86; 114 Pac. 890. His estate was insolvent when the debt came into existence. We hold that the petitioner is entitled to deduct the amount in controversy as a debt ascertained to be worthless and charged off in 1936.

### Salary Issue.

The respondent makes the general contention under the second issue that, where salary is accrued and deducted from income and the liability is satisfied in a subsequent year for less than its face amount, the difference between the liability and the amount for which it was satisfied constitutes taxable income. The rule laid down by the Board in and since *Central Loan & Investment Co.*, 39 B. T. A. 981, has been that such an amount is not income unless the deduction made in a prior year served to offset taxable income. *Estate of James N. Collins*, 46 B. T. A. 765; *Estate of Charles H. Robinson*, 46 B. T. A. 943; *Citizens State Bank*, 46 B. T. A. 964.

Here the petitioner had a net loss in 1931 of $90,116.67 and no contention is made that the compensation canceled in 1936 was not de-

ducted in arriving at the net loss. Accordingly we sustain the petitioner on this issue.

### Insolvency Issue.

In his determination of the deficiency for 1936 respondent held that petitioner was not insolvent at any time during the period of its receivership in that year and therefore was not exempt from surtax on $89,476.51 of undistributed net profits under the provisions of section 14 (d) (2) of the Revenue Act of 1936.[1]

The difference between the parties is whether petitioner was insolvent in 1936 during the period of receivership. They agree that if it was insolvent at any time during that period the statute exempts petitioner from surtax.

In *Artesian Water Co.*, 43 B. T. A. 408, we said that the word "insolvent" as used in section 14, *supra*, "was intended by Congress to carry the meaning used" by the Supreme Court in *Dutcher* v. *Wright*, 94 U. S. 553. In that case the Court said that "Insolvency, in the sense of the Bankrupt Act, means that the party whose business affairs are in question is unable to pay his debts as they become due, in the ordinary course of his daily transactions." We thought this was evidenced by the Senate Finance Committee Report on the provision, in which the committee said:

The Finance Committee Bill also avoids the possibility of tax avoidance by collusive Receiverships by limiting the provision to cases in which the corporation is in bankruptcy under the Federal bankruptcy laws, and to cases in which it is insolvent, i. e., its liabilities are in excess of its assets or it is unable to pay the claims of creditors as they mature—and in receivership in Federal or State Courts.

In holding that the petitioner did not come within the exemption provided by the statute, we referred to proof that during the taxable year its assets were about ten times its liabilities, exclusive of capital stock and surplus, and that it had made payments on some of its obligations.

Regulations 94, promulgated for the Revenue Act of 1936, does not define the meaning of insolvent. See art. 14–1. Article 13–4 of Regulations 101, Revenue Act of 1938, defines the term insolvent as meaning "insolvency in the sense of excess of liabilities over assets and in the sense of inability to meet obligations as they mature."

Regulations 103, applicable to the Internal Revenue Code, defines the term insolvent as meaning "insolvency either in the sense of excess

---

[1] SEC. 14. SURTAX ON UNDISTRIBUTED PROFITS.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(d) EXEMPTION FROM SURTAX.—The following corporations shall not be subject to the surtax imposed by this section:

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(2) Domestic corporations which for any portion of the taxable year are in bankruptcy under the laws of the United States, or are insolvent and in receivership in any court of the United States or of any State, Territory, or the District of Columbia.

of liabilities over assets or in the sense of inability to meet obligations as they mature." Sec. 19. 13-4. A definition that "insolvency is established if liabilities exceed assets or if the debtor corporation is unable to meet its obligations" was agreed upon by the parties in *United States* v. *Anderson*, 119 Fed. (2d) 343. In that case the court said that in determining insolvency "the court should allow for reasonable use of the debtor's credit."

The United States Circuit Court of Appeals, in reversing *Artesian Water Co.*, *supra*, said that as the taxpayer's assets exceeded its liabilities and it was not, therefore, insolvent in a bankrupt sense, solvency or insolvency turned upon whether "the taxpayer was able to meet its obligations as they matured, in the usual course of trade or business." 125 Fed. (2d) 17. It decided that the taxpayer was unable to meet its obligations, "either from its current assets or with 'the reasonable use of the debtor's credit' (*United States* v. *Anderson Co.*, supra.)"

We think a corporation is insolvent within the meaning of section 14 (d) (2), *supra*, if at any time during receivership it is unable to meet its obligations as they mature in the ordinary course of business, with a reasonable use of its credit.

All of petitioner's oil and gas property was in the possession and control of trustees appointed by the court in the *Julian* v. *Schwartz* litigation. The remaining assets were in the possession and control of a receiver appointed in the litigation instituted by D. R. Morrow in 1931. The balance sheets of petitioner at the close of the years 1932, 1933, 1934, and 1935 reflect, exclusive of the oil and gas properties, no cash on hand. Other assets on which something might have been realized consisted of supplies in the amount of $594.09, patents $1,000, stock issued for service and leases $219,120.50, and accounts receivable of $35,507.19. Its liabilities, consisting of notes and accounts payable, accrued expenses and amounts due stockholders, were $55,-611.12, $43,580.75, $43,111.14, and $43,789.66, respectively, at the close of 1932, 1933, 1934, and 1935. The balance sheets of petitioner as of the termination of the receivership and at the close of 1936 were not introduced in evidence. Testimony, however, established that there were no substantial changes before the termination of the receivership in 1936.

Though the final accounting of the receiver disclosed obligations incurred as early as 1931, the record does not disclose whether any of the debts shown by the balance sheets, except salary accrued in 1931 in favor of Guy L. Hardison in the amount of $14,000, but which was involved in the litigation instituted by D. R. Morrow in 1931, matured during the receivership. No evidence was offered as to the arrangements made, if any, with the creditors for payment of these debts.

The burden was on petitioner to establish its insolvency and any deficiency of proof must operate against it. No attempt was made to show inability to meet maturing debts by a reasonable use of credit. It is true that the oil and gas properties were in the possession and control of the trustees and for that reason could not have been used by the receiver as collateral for a loan, but he had under his control stock of a book value of about $220,000. Nothing of record is opposed to the idea that this stock could have been used as security for a loan or sold to pay debts. Neither does it appear that an application was ever made to the court for permission to sell receiver's certificates or otherwise raise funds to meet matured obligations.

We do not regard as helpful to petitioner the statement appearing in the court order of November 12, 1936, that petitioner was no longer insolvent by reason of the litigation. It does not appear that the court ever had before it the question of solvency or insolvency of petitioner. Neither does it appear that any of the parties in interest ever alleged such a fact in pleadings before the court. On the contrary, the complaint filed by D. R. Morrow, which resulted in the appointment of the receiver, alleged, among other things, that the corporation had been in a prosperous condition and was then operating at a profit, but that the profits were being diverted from the stockholders and petitioner. The receiver does not appear to have received any funds until the latter part of 1936, when his expenses were paid out of receipts from the trustees, but inability to pay due to impounding of assets in a receivership, not based upon grounds of insolvency, is not proof of insolvency in the sense of inability to meet maturing debts. The receivership of itself does not prove insolvency.

The petitioner has failed to prove that it was insolvent at any time during the period of receivership in 1936. Accordingly we sustain the respondent on this issue.

### Depletion Issue.

In his determination of the deficiency for 1936 respondent allowed depletion on $142,989.99, representing the amount received by petitioner in cash and credits in that year out of the funds impounded by the trustees in the *Julian* v. *Schwartz* litigation. He contends here that that amount constitutes petitioner's gross income and net income during the taxable year from the operation of the wells by the trustees. Petitioner contends that it is entitled to depletion on not only the $142,989.99 thus received, but on the additional amount of $223,352.83, representing expenses incurred by the trustees in the operation of the properties, all of which was chargeable to and charged to petitioner. Thus petitioner seeks depletion on $366,342.82 and respondent asks us to restrict it to the net amount. The facts are

not in dispute. Depletion on the production of the wells in 1936 after petitioner acquired possession of the wells and in 1937 is not in controversy.

Petitioner insists that its economic interest in the production of all of the wells was $488,903.65 and that it could not actually or constructively receive the net economic interest of $265,550.82 ($488,-903.65 less operating expenses of $223,352.83) without constructively receiving the $223,352.83 charged to it for operating expenses.

The parties agree that under the rule of *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417, no part of the proceeds of production constituted taxable income to petitioner until received by it. They also reached an agreement in 1937 that no income tax liability would be assessed against the trustees for the years 1931 to 1936, but that the recipients of the proceeds of production would be liable for income taxes in the year or years in which the funds were distributed.

We think the question is controlled by *Crews* v. *Commissioner*, 89 Fed. (2d) 412, affirming, on the point involved herein, 33 B. T. A. 441.[2] In that case in 1922, while certain litigation relating to failure to drill offset wells was pending, the lessors of oil property entered the undeveloped section of the leased land and began development thereof. The Sinclair Oil & Gas Co., operator of the developed portion of the property as assignee of the lease, served notice that it claimed a right to such production as might be obtained by the lessors. To provide an outlet for their production, the lessors entered into an escrow agreement under the terms of which seven-eighths of the proceeds of production was to be deposited in escrow in a bank, subject to payment to the proper parties in interest when the litigation was settled, the escrow agent to pay to the lessors in the meantime such sums out of the escrow funds as were necessary for them to use in further developing the land. The litigation was settled in October 1930. Prior thereto there was expended out of the escrow funds the sum of $849,544.37 for drilling, equipping and operating wells and for miscellaneous purposes incident to the production of oil and gas. While this arrangement was in effect the lessors produced from the property entered by them oil and gas in the amount of $1,462,504.02. Aside from the moneys expended for development and operating purposes, no part of the escrow funds was actually paid to the lessors, due, among other things, to misappropriation of funds by officials of the bank and worthlessness of an indemnity agreement executed in connection with the matter and the giving of a release by the lessors in favor of the bank.

The question involved in the proceeding was the amount of depletion to which the lessors were entitled, in connection with which it

---

[2] For a complete history of the proceeding see also 30 B. T. A. 615; 31 B. T. A. 187; 37 B. T. A. 387; 108 Fed. (2d) 712; 120 Fed. (2d) 749; 33 B. T. A. 36.

was necessary to determine the amount of gross income from the property. We held that gross income from the property was $1,462,-504.02 less $514,000 representing bonds purchased with escrow funds by the bank, no part of which, however, was ever received by the lessors, plus $355,000 received from Sinclair in 1930, the taxable year, in settlement of the litigation, a total of $1,303,504.02. Upon appeal the court held that the gross income from the property was $1,204,-544.37, being $849,544.37 plus $355,000. Subsequent consideration of the proceeding by this Board and the Circuit Court of Appeals did not in any wise alter the conclusion thus reached that upon settlement of the litigation and the termination of the escrow agreement in 1930, the taxable year, the amount of $849,544.37 paid out of production for development and operating purposes constituted gross income.

In that case, as already indicated, there was nothing in the escrow fund in 1930 to pay over to the lessors. Hence none of the proceeds of production were actually received, except for the $849,544.37 expended for development and operating purposes. Here the proceeds of production during the pendency of the *Julian* v. *Schwartz* litigation were in excess of operating expenses paid by the trustees out of production and upon the final termination of the litigation in 1936 only a part of the net proceeds was paid to petitioner. We do not think this point of difference in the facts of the two proceedings requires a different conclusion. The expenditures were made out of production of oil and gas for the benefit of petitioner. Under *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417, we must consider the petitioner as having received no income until its right thereto was determined and receivership terminated, which was in 1936, and that the fact that the money was earned in previous years does not control; and the *Crews* case applies the principle there enunciated squarely to gross income, arising from oil production in years earlier than the year of receipt, for the purpose of computing depletion. This is consistent with the agreement of the parties that taxation would fall in the years when the funds were distributed. We hold the item of $223,352.83 to be gross income in 1936 from the property and that the Commissioner erred in refusing to allow petitioner depletion thereon. Depletion will accordingly be recomputed on the basis of $488,903.65 as the gross income from the property, the amount of depletion on the entire property for the year 1936 not to exceed, however, 50 percent of the net income from the property. There appears to be no difference of opinion between the parties on the facts necessary to compute the net income from the property.

The respondent is contesting the allowance of petitioner's claim for a loss of $43,151.96 upon the relinquishment in 1937 to J. A. Smith of its one-half interest in Well No. 16 upon the ground that the petitioner has failed to prove the cost or other basis of the property. Petitioner relies upon its Exhibit No. 57 to establish the amount of its loss. This exhibit is a statement prepared from petitioner's books showing entries made therein for the cost of tangible well equipment, less depreciation, and intangible drilling cost, less depletion and depreciation on drilling equipment.

In his determination of the deficiency the respondent disallowed a loss of $38,984.02 claimed by petitioner in its return upon the ground that the alleged loss did not fall within the provisions of section 23 of the Revenue Act of 1936. During the course of the hearing in this proceeding respondent's counsel announced that the amount of the loss was in dispute. Exhibit No. 57 was offered by the petitioner "for the purpose of showing the method and the manner in which petitioner arrived at the figure of $43,151.96 * * * and not for the purpose of showing that it is evidence of the fact that they did sustain that, but to show how we arrived at that figure, to show our method of computing." Counsel for the respondent objected to the introduction of the document in evidence "in the form offered as being immaterial." The objection was overruled and the exhibit was admitted in evidence "for the purpose stated by counsel."

The method employed in determining the amount of a loss is not in every instance proof of cost or other basis. It does not prove the cost in this proceeding. Respondent never agreed that petitioner's books reflected actual cost of the well. Petitioner deducted from the book costs of tangible equipment a total of $17,889.48 for depreciation. Whether this amount represents the "amount allowed (but not less than the amount allowable)" within the meaning of section 113 (b) (1) (B) of the Revenue Act of 1936 does not appear. Depreciation in the amount of $3,604.26 on drilling equipment was included in a total of $74,167.31 for intangible drilling costs. No evidence was offered to prove whether the item of $3,604.26 represents the correct figure for depreciation and the record is devoid of any evidence to show that these intangible drillings costs were not deducted as ordinary and necessary business expense in the year in which they were incurred, as permitted by article 243, Regulations 74. The balance sheet as of the close of 1935 has an item of $60,908.31 for intangible drilling costs of the well, but that does not, without more, prove that petitioner has not had tax benefit from

the expenditure. No allowance was made by petitioner in the computation for the salvage value of the well.

The evidence of record fails to prove the amount of any loss sustained by petitioner in connection with the transfer of its interest in Well No. 16. Accordingly we sustain the respondent on this issue.

*Decision will be entered under Rule 50.*