*Decision will be entered under Rule 50.*

FRANK B. INGERSOLL, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 6000.    Promulgated June 6, 1946.

*David B. Buerger, Esq.*, and *Paul G. Rodewald, Esq.*, for the petitioner.

*Brooks Fullerton, Esq.*, for the respondent.

OPINION.

SMITH, *Judge*: The respondent has determined a deficiency in petitioner's income tax for 1941 in the amount of $8,139.85. The deficiency results for the most part from the disallowance of a deduction

---

[3] *Premier Packing Co.*, 12 B. T. A. 637.

of $12,257.72 claimed by the petitioner in his return as a bad debt loss resulting from a payment which he made to a bank as guarantor of a note given by a family corporation.

Petitioner is an individual engaged in the practice of law, with offices in the Union Trust Building, Pittsburgh, Pennsylvania. He filed his income tax return on the cash basis for the taxable year 1941 with the collector of internal revenue for the twenty-third district of Pennsylvania, at Pittsburgh.

In 1935 petitioner owned 20 of the outstanding 200 shares of capital stock of the Fort Duquesne Laundry Co., a corporation which for many years had operated a laundry business in the vicinity of Pittsburgh. Petitioner's mother owned 130 shares of the stock, and the balance was owned by his two sisters, a brother, and a brother-in-law.

The Fort Duquesne Laundry Co., hereinafter referred to as the corporation, operated profitably for most of the period from 1910 to 1928. It had an earned surplus at December 31, 1928, of $47,218.50. Due to the business depression and other causes the corporation suffered operating losses for each of the years 1929 to 1934, so that at December 31, 1934, its earned surplus had been reduced to $22,726.36. It had cash and accounts receivable of $4,420.59, while its accounts payable amounted to $10,655.22, of which $3,070.25 was owed to petitioner for moneys advanced at various times for operating expenses. The Union Trust Co. of Pittsburgh held a mortgage note of the corporation for $15,000, secured by the land and buildings. There was also $7,642.68 of water rent due the city of Pittsburgh, which had priority over the mortgage and other debts.

On learning about the water rent arrears the bank in 1935 threatened to foreclose on its mortgage unless the account was cleared up. The officers and directors of the corporation discussed the matter with petitioner and requested him to induce the bank to extend the mortgage note. The petitioner had been instrumental in getting the bank to loan the money in the first instance and the bank had given petitioner much business in the past. He did not want to see the bank lose anything on the loan. He requested the bank not to foreclose the mortgage. The bank was willing to do so, provided petitioner would personally guarantee payment of the mortgage note. Petitioner in 1935 gave the bank his oral promise that he would pay the note if the corporation failed to do so, and the bank agreed not to foreclose.

The corporation continued to operate at a loss each year and from time to time petitioner advanced additional funds to meet the pay roll and other expenses. At October 31, 1940, there was a deficit of $5,832.30 in earned surplus. Cash and accounts receivable were approximately $5,000, while the accounts payable aggregated $42,-936.03, including $21,670.40 of water rent and $10,229.93 owed to the

petitioner. The bank was pressing petitioner for settlement of the mortgage note on his guaranty agreement.

In the latter part of 1940 petitioner, who was then engaged in the trial of a case in New York, asked an associate in his law office in Pittsburgh, Emory R. Kyle, to investigate the corporation's affairs and see if some plan could be worked out for an adjustment of its debts. Petitioner felt that the conditions which had caused the corporation's financial difficulties were temporary and that the general outlook of the business was good.

After Kyle had made his investigation it was decided that the corporation would have to be reorganized. A tentative plan of reorganization was agreed upon by the stockholders and principal creditors and on December 4, 1940, a petition was filed in the United States District Court for the Western District of Pennsylvania for reorganization under chapter X of the Bankruptcy Act. It was alleged in the petition that the corporation was unable to pay its debts. The petition was approved by the court and on May 9, 1941, the court confirmed an amended plan of reorganization, which embodied the following essential features:

(a) The city of Pittsburgh would receive 25 per cent of its claim (principal and interest) for water rent;

(b) The Union Trust Co. would receive 20 per cent of the amount due on the mortgage note;

(c) The general creditors would receive 10 per cent of their claims; and

(d) Petitioner would make a new loan of $14,000 to the corporation to pay the creditors and the expenses of reorganization, the loan to be secured by a mortgage on all of the corporation's real estate, buildings, machinery, and equipment, and also by all of the capital stock of the corporation.

The Union Trust Co. agreed to the reorganization only upon the condition that petitioner should remain liable personally upon his guaranty of the mortgage note.

As a general creditor of the corporation, petitioner in 1940 received 10 per cent of the $10,229.93 which the corporation owed him. He charged off the balance of his debt as worthless in his income tax return for 1940 and the deduction was allowed by the Commissioner.

All but $1,000 of petitioner's new loan to the corporation had been repaid at the time of the hearing of this proceeding, and no question as to that loan is now before us.

On May 10, 1941, the Union Trust Co. notified petitioner that it had received a payment from the corporation on the mortgage note of $2,987.43, representing 20 per cent of its claim, and requested petitioner to pay the balance of the principal and interest thereon, amounting to

$12,257.72. Petitioner paid that amount to the bank on May 12, 1941, in full discharge of his obligation under the guaranty agreement with the bank. He claimed that amount as a bad debt deduction in his return for 1941. The respondent disallowed the deduction.

In his petition in this proceeding petitioner alleges that the respondent erred in not allowing the deduction of the $12,257.72, either as a bad debt or as a business loss. He urges in his brief that the amount is deductible as a bad debt.

We do not think that the amount is a legal deduction from gross income as a debt which became worthless in 1941. In order to have a deduction for a debt becoming worthless there must be a debt owed to the petitioner. There never was such a debt in the instant proceeding. The alleged debt did not arise until the petitioner made the payment on May 12, 1941. This is because the petitioner makes his returns on a cash receipts and disbursements basis. The debt of the laundry to the bank was wiped out on the reorganization. After the petitioner paid the amount here in question neither the bank nor the laundry owed the petitioner any part of it. The petitioner was not subrogated to any rights which the bank had against the laundry prior to the reorganization. This is admitted.

The petitioner also contends that, if the amount is not a legal deduction as a debt which became worthless in 1941, it was a business loss which is deductible from gross income. The only objection which the respondent has to this claim is that the petitioner was a stockholder of the laundry and that the payment of the amount here in question was an additional investment in his stock. In support of this contention he cites *Menihan v. Commissioner* (C. C. A., 2d Cir.), 79 Fed. (2d) 304, which affirmed our decision in 29 B. T. A. 169. The facts in that case were that Menihan owned 497 out of 500 shares of the stock of the Menihan Co., a corporation, and beneficially owned the other 3 shares. Both Menihan and the corporation were insolvent in 1924. A creditors' committee was appointed by the creditors of the corporation and employed Menihan to handle its affairs at a salary plus a percentage of the profits. All of the shares of stock were transferred to the creditors' committee. The corporation had given notes to its creditors which were guaranteed by Menihan. He later paid off his liability on the notes and recovered possession of his shares of stock. We held and the court held that he sustained no deductible loss from such payments. They were in effect amounts which he paid for the recovery of his shares of stock. On its face the facts in that case are materially different from those present in the instant proceeding. In guaranteeing the bank against loss on its mortgage note, the petitioner was not primarily interested in protecting his stock interest.

Asked what his motives were in guaranteeing the bank against loss, the petitioner replied:

Well, I think the principal motive that I had, that I already had $4,000 in that laundry and I owned a ten percent interest in it. I had another motive. I had established a credit at the Union Trust Company. It had honored me with quite a little business of a professional nature. I have had some very substantial fees for cases that I had with the Trust Department of that bank, and I was very zealous and jealous of my reputation with that bank. I didn't want to see it sullied by them having to foreclose a mortgage in a concern in which I was interested.

It is also true that I would have hated very much to see the laundry go to the wall. It had been in the family all through the years.

The situation here is much the same as that which obtained in *Daniel Gimbel*, 36 B. T. A. 539, where the taxpayer guaranteed an obligation of a corporation, substantially all of the stock of which was owned by him and his brothers, and we allowed the guaranteed payment as a bad debt. We said:

The evidence here is clear. When petitioner made his payments, both on his endorsements and his guaranties, he had no illusions about the condition of the corporation and no intention to invest more capital. He paid only because he was legally obligated to do so, and the obligation was not an incident of his being a shareholder, but was incurred with the intention of creating a potential debtor and creditor relation. To attribute to him an intention to invest more money in the corporation's shares is contrary to the express evidence and not a fair inference from the circumstances. And it is equally clear that there was no intention to make a gift.

The petitioner had been instrumental in getting the Union Trust Co. to lend the $15,000 to the laundry prior to 1930. The bank had given the petitioner important business in the past and the petitioner could not afford for business reasons to incur the ill will of the bank. Furthermore, the petitioner had loaned money to the laundry, which would have been lost if there had been a foreclosure of the mortgage. These appear to have been the principal considerations which led the petitioner to guarantee the bank against loss.

We think that the petitioner sustained a business loss in 1941 of $12,257.72, which is deductible from his gross income for that year.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

HILL, *J.*, concurs only in the result.

———

LEECH, *J.*, concurring: I doubt the deductibility of the disputed item as a loss. There is, however, it seems to me, evidence upon which it may be deductible as an ordinary business expense under section 23 (a) (1) (A) of the Internal Revenue Code in connection with the business of petitioner as a lawyer. Therefore I am inclined to concur.

OPPER, *J.*, agrees with the above.

HARRON, *J.*, dissenting: In 1941 the laundry company was a going concern and petitioner's investment remained in the business. The Union Trust Co. did not, in fact, give up its claim for $12,257.72 which represented, in fact, a debt of the laundry company. When petitioner, a stockholder, paid such amount of the corporation's debt, he made a contribution thereof to the corporation. It is not shown, nor claimed, that petitioner loaned the above amount to the corporation. Therefore, it seems to follow, as a matter of both fact and law, that petitioner's investment in the corporation was increased by $12,257.72, and he can not sustain a loss for tax purposes until he makes a final disposition of his stock in the laundry company. The position taken by the Union Trust Co. with respect to the reorganization under the Bankruptcy Act was rather unusual. However that may be, petitioner simply assumed part of a debt of the corporation which was not brought into the reorganization settlements of claims of creditors. Under the particular facts, I do not agree that the reorganization under the Bankruptcy Act controls the question so as to give support to petitioner's contention.