## J. Meredith Siple and Delia W. Siple, Petitioners v. Commissioner of Internal Revenue, Respondent

Docket No. 5323–67.  Filed January 14, 1970.

*Bruce R. Bailey,* for the petitioners.
*Richard G. Daly,* for the respondent.

### OPINION

Tannenwald, *Judge:* The respondent determined deficiencies in the petitioners' income tax for the calendar years 1960, 1963, and 1964 in the respective amounts of $35,435.63, $343.25, and $16,262.54. All of the facts have been stipulated by the parties and accordingly the proceeding was submitted under Rule 30 of the Court's Rules of Practice.

At the time of filing their petition, J. Meredith Siple and Delia W. Siple, husband and wife, were residents of Glendale, Calif. Their joint Federal income tax returns for the calendar years 1960, 1963, and 1964 were prepared and filed on the cash receipts and disbursements method of accounting with the district director of internal revenue at Los Angeles, Calif.

1

For a number of years prior to 1957, Willis O. Mizner and Ruth E. Mizner owned and operated a general grocery market at King's Beach, Calif. On April 23, 1957, the Mizners caused to be organized a Nevada corporation known as the King's Beach Stop & Shop Market, Inc. (hereinafter referred to as King's Beach), with an authorized capitalization of 200,000 shares of $1 par value common stock. The Mizners transferred all of their accounts receivable, accounts payable, and inventory to the corporation in exchange for 4,000 of these shares.

The Mizners, noting that the economy of the Reno-Tahoe area was prospering, decided to diversify and expand the business of King's Beach. From projections furnished by the Brunswick Corp., they determined that a bowling alley and restaurant would be profitable. They therefore decided to construct a 12-lane facility adjacent to their market. This location was desirable because the Mizners held a long-term ground lease on several lots adjoining the market. The Mizners decided to use King's Beach as the corporate entity through which to carry out this project. A projected *pro forma* financial statement reflecting the proposed venture as of April 30, 1959, was used by King's Beach.

Since King's Beach had limited funds and borrowing power, it was necessary for the corporation to secure additional financing. The Mizners approached petitioners concerning a possible advance to the corporation.

After an extended period of discussion it was orally agreed that petitioners would purchase a number of shares from King's Beach for $100,000 and would advance an additional $50,000 to the corporation. It was also agreed that petitioners would attempt to induce the Reno branch of the First National Bank of Nevada (hereinafter referred to as the bank) to advance to King's Beach a sum not to exceed $200,000. It was contemplated that petitioners would pledge certain securities as collateral for the loan.

The oral agreement was reduced to writing by the Mizners' attorney, upon whom petitioners relied since they had no attorney of their own. The written agreement was signed by Willis O. Mizner for King's Beach and by both Mizners and petitioners in their individual capacities on October 22, 1959, and is hereinafter referred to as the agreement of October 22, 1959.

The agreement provided in pertinent part:

1. The Third Parties [petitioners] agree they will make arrangements with the First National Bank of Nevada, First & Virginia Branch, Reno, Nevada, by depositing with said bank securities owned by the Third Parties whereby said First National Bank * * * will lend to the Third Parties for the use and benefit of First Party [King's Beach] from time to time, not to exceed the sum of $200,000.00; said advancements to be made by said bank only upon the written

request of Willis O. Mizner, as president of the First Party, and upon receiving the duly executed promissory notes of First Party evidencing each of said advancements, which said notes shall be made payable to the Third Parties. The agreement further provided that the money was to be used by King's Beach for various purposes in connection with the proposed expansion. The Mizners were to deliver their 4,000 shares of King's Beach stock, duly endorsed, to the petitioners "for the purpose of securing the notes to be given by * * * [King's Beach] to [petitioners] * * * covering advances made by the First National Bank of Nevada." As long as such advances were outstanding, the petitioners had the sole right to vote the Mizners' stock.

In addition, the agreement went on to state that, within 30 days after King's Beach notified petitioners that the building was completed, the petitioners would purchase 2,562 shares of the authorized but unissued stock of King's Beach from the corporation for $100,000. The money was to "be used to pay off all or a portion of indebtedness of First Party [King's Beach] to First National Bank of Nevada and to the Third Parties [petitioners] resulting from money advanced to the First Party by said First National Bank."

The agreement also contained an option, exercisable by petitioners for 1 year after the date of purchase of the 2,562 shares, to purchase an additional 1,281 shares for $50,000. This money was to be used in the same fashion as the $100,000.

Following the portion of the agreement detailing the stock purchase and the option arrangements, it is stated:

6. First Party [King's Beach] agrees that while the arrangements by the * * * [petitioners] with the First National Bank of Nevada make the * * * [petitioners] primarily liable to said bank for all advancements made by it to the First Party, that such advancements are solely for the use and benefit of First Party and that the First Party will fully repay the same to said bank and/or to the Third Parties, together with all interest or other charges thereon.

On the same day that the above agreement was signed, October 22, 1959, petitioners and King's Beach executed a bank form entitled "Pledge Agreement for Lent Collateral" which contained two distinct agreements. The first agreement was signed by the Mizners for King's Beach. Beneath the Mizners' signatures followed a second agreement which commenced:

FOR AND IN CONSIDERATION of any financial accomodation given or to be given or continued to KING'S BEACH STOP & SHOP MARKET, INC., hereinafter called the "Debtor", by THE FIRST NATIONAL BANK OF NEVADA, * * * the undersigned does hereby assign, transfer to and deposit with the Bank all property this day delivered by the undersigned or the Debtor to the Bank * * *

The final sentence of the agreement states that it is not to be construed to make "the undersigned a guarantor or surety of the indebted-

ness of said debtor" and is followed by the signature of the petitioners. In accordance with the agreement, petitioners pledged Minnesota Mining & Manufacturing stock which had at all material times a fair market value in excess of the outstanding debt.

Also on October 22, 1959, the bank agreed to advance the sum of $200,000 to King's Beach. This obligation of King's Beach was evidenced by a note payable to the bank for $200,000 with 5¼-percent-per-annum interest. The note was signed by the Mizners in their capacities as officers of King's Beach.

At no time did King's Beach or the Mizners give the petitioners any notes, nor did the Mizners transfer any of their King's Beach stock to petitioners as security for petitioners' agreement to pledge securities to the bank. The petitioners acquiesced in this variation from their agreement with King's Beach and the Mizners.

By June of 1960 the building had been erected at a cost exceeding $300,000 instead of the $200,000 initially estimated. These additional costs were due to design changes, one of which expanded the number of bowling lanes from 12 to 16.

On June 17, 1960,[1] petitioners, the Mizners, and King's Beach entered into a "Supplementary Agreement," which due to the additional costs of construction amended the original agreement between petitioners, the Mizners, and King's Beach to provide that the $100,000 paid by petitioners to purchase 2,562 shares of King's Beach stock would be applied toward payment in full of all cafe and bar conditional sales contracts in a sum not exceeding $40,000; $25,000 would be used for the balance of the construction contract, and the remainder and not less than $35,000, would be used "in partial payment of the present indebtedness of * * * [King's Beach]" to the bank.

Due to the increased costs and to lack of revenue, King's Beach renewed its note with the bank (the original due date had been April 22, 1960) and obtained further advances culminating in two final notes in the total principal sum of $295,000. All of the notes were made payable to the bank and were signed by the Mizners for King's Beach. The two final notes were in amounts of $275,000 due May 20, 1963, and $20,000 due September 30, 1963. All of these notes were secured by the collateral pledged by petitioners to the bank, with the knowledge of the petitioners.

As a result of unforeseen circumstances, the operations of King's Beach proved unprofitable. Although the Mizners remained optimistic about eventual success, the petitioners were convinced that the venture had failed and that there was no chance of recouping their stock investment.

---

[1] The stipulation of facts gives this date as June 7, 1960. This is, however, apparently a typographical error because the supplementary agreement is dated June 17, 1960.

The petitioners desired to avoid further liability, while the Mizners wanted to repurchase petitioners' stock so that they could approach other, more optimistic, business associates. Therefore, on May 23, 1963, a document entitled "Agreement and Bill of Sale" was executed. This document (hereinafter referred to as the agreement of May 23, 1963) provided as follows:

### AGREEMENT AND BILL OF SALE

THIS AGREEMENT, made this 23rd day of May, 1963, by and between WILLIS O. MIZNER, President of the KINGS BEACH STOP & SHOP MARKET, a Nevada Corporation, party of the first part, and J. MEREDITH SIPLE, party of the second part,

### WITNESSETH:

WHEREAS, party of the second part is presently a stockholder of the Kings Beach Stop & Shop Market, and,

WHEREAS, party of the second part has made loans to the Kings Beach Stop & Shop Market for maintenance and operations, and for the construction of a building to house a bowling alley, and

WHEREAS, party of the first part has pledged his stock to party of the second part for the performance of the payment of the Kings Beach Bowl building, and,

WHEREAS, said Stop & Shop Market is heavily indebted and may be forced to file a petition in bankruptcy, and,

WHEREAS, party of the first part desires to purchase all of the right, title, and interest of party of the second part in and to all assets, accounts, fixtures, and causes of action now possessed or hereafter acquired by said Kings Beach Stop & Shop Market, or by party of the second part against said King's Beach Stop & Shop Market, or against party of the second [sic] part,

Now, THEREFORE, in consideration of the foregoing and the hereinafter contained convenants and agreements, party of the second part does hereby sell, assign, transfer, set over, and convey unto party of the first part all of the right, title and interest of party of the second part in or to any of the assets, common stock, accounts, reserves, inventories, causes of action, or any other form of assets presently owned by party of the second part or hereafter acquired by party of the second part, against party of the first part or the Kings Beach Stop & Shop Market, a Nevada corporation, for the sum of Thirty Thousand Dollars, payable as follows:

1. Ten Thousand Dollars ($10,000.00) cash, upon execution of this agreement, the receipt of which is hereby acknowledged;

2. A promissory note in the amount of Twenty Thousand Dollars ($20,000.00), payable Five Thousand Dollars ($5,000.00) per year, commencing on the first day of June, 1964, and on the first day of June of each and every year thereafter until the full amount thereof has been paid, together with interest in the amount of five percent (5%) per annum on all balances remaining due and unpaid.

IN WITNESS WHEREOF, the parties hereto have executed this agreement the day and year first above written.

KINGS BEACH STOP & SHOP MARKET,
A Nevada Corporation
By: (S) W. O. Mizner
WILLIS O. MIZNER, *President*
(S) J. Meredith Siple
J. MEREDITH SIPLE
(S) Delia W. Siple

Pursuant to the agreement, petitioners received $10,000 in cash and a note for $20,000 signed by Willis O. Mizner in his personal capacity only. King's Beach did not sign or endorse this note. No payments were ever made on this note.

King's Beach failed to satisfy its obligations to the bank, and, by letters dated June 5 and June 10, 1963, the bank made demand on petitioner J. Meredith Siple for payment of the indebtedness of, first, $275,000, and, then, $295,000, respectively, plus accrued interest. Both letters state substantially the same thing—that, since the bank is unable to collect the amount from King's Beach, "Demand is made upon you in accordance with the indemnity agreement you signed on October 22, 1959."

In order to avoid a sale of the pledged stock by the bank, petitioner J. Meredith Siple acknowledged the bank's demand and sent a check for $130,000 on June 10, 1963. Although petitioners had no personal liability on the King's Beach indebtedness, they executed a note to the bank evidencing their arrangements for payment of the balance due from King's Beach. The bank accepted this note in lieu of exercising its rights under the pledge agreement. On June 19, 1963, the bank returned 3,500 shares of the petitioners' Minnesota Mining & Manufacturing Co. stock which it no longer needed as security for the outstanding indebtedness. The bank did, however, retain 5,000 shares. In addition the bank assigned, without recourse, the two final notes of King's Beach. These evidenced total indebtedness of $295,000.

On December 9, 1963, petitioners made a further payment of $20,000 and petitioner J. Meredith Siple executed a new note for $145,000. This note was paid in 1964. The petitioners have not received any reimbursement for any of the foregoing payments.

The petitioners deducted the payments of $150,000 in 1963 and $145,000 in 1964 as losses incurred in a transaction entered into for profit pursuant to the provisions of section 165(c)(2).[2] In 1964, petitioners made application for a tentative carryback adjustment, which was allowed, producing an overassessment of $35,435.63 for petitioners' 1960 income taxes. This amount was refunded. Thereafter, respondent issued the deficiency notice involved herein, in which he treated the claimed losses as capital losses and disallowed the claimed deductions from ordinary income for 1963 and 1964 with the concomitant disallowance of the carryback to 1960.

In 1959, when petitioners determined to extend financial assistance to King's Beach, they did so in three ways: (a) They purchased a substantial equity position in King's Beach for $100,000; (b) they made a direct loan of $50,000 to King's Beach; and (c) they agreed, in

---

[2] All references are to the Internal Revenue Code of 1954, as amended.

the event of default, to indemnify the First National Bank for its advances to King's Beach but only to the extent of the realizable proceeds from the sale of Minnesota Mining & Manufacturing stock which they pledged as collateral for those advances. The October 22, 1959, agreement, which set forth the arrangements with respect to such financial assistance, specifically provided:

6. First Party [King's Beach] agrees that while the arrangements by the * * * [petitioners] with the First National Bank of Nevada make the * * * [petitioners] primarily liable to said bank for all advancements made by it to the First Party, that such advancements are solely for the use and benefit of First Party and that *the First party will fully repay the same to said bank and/or to the Third Parties* [petitioners], together with all interest or other charges thereon. [Emphasis added.]

Thus, it is clear that initially there was a direct promise of reimbursement by King's Beach. Such a promise to pay money clearly would have constituted a debt obligation if it had still been extant at the time petitioners' collateral had been sold or, as is the case herein, petitioners made the payments of $295,000 in order to release their collateral. See *Barnhart-Morrow Consolidated,* 47 B.T.A. 590, 599–600 (1942); *Ambrose D. Henry,* 8 B.T.A. 1089, 1097 (1927). Under such circumstances, *Putnam* v. *Commissioner,* 352 U.S. 82 (1956), would have controlled petitioners' deduction.

The problem presented herein stems from the effect to be given to the agreement and bill of sale dated May 23, 1963, with respect to whatever claim petitioners may have had against King's Beach arising out of the possible use of petitioners' collateral in liquidating the indebtedness of King's Beach to the bank. Initially, we note that the parties have treated this agreement as reflecting a relinquishment to King's Beach of any such claim by petitioners. While this treatment is subject to question,[3] we consider it appropriate to dispose of the case on this mutually accepted foundation.

---

[3] The agreement refers to King's Beach separately from the "party of the first part" and the "party of the second part," which are described in the beginning as Mizner and Siple. The operative provisions state that "party of the second part [Siple] does hereby sell, assign, transfer, set over, and convey unto party of the first part [Mizner] all of the right, title and interest of party of the second part in or to any * * * causes of action * * * presently owned by party of the second part or hereafter acquired by party of the second part, against party of the first part or the King's Beach Stop & Shop Market." Taking this language at face, it appears to be a sale to Mizner of stock, the direct indebtedness of $50,000, and the contingent claim for reimbursement in the event of payment to the bank by petitioners. Neither the fact that Mizner is described in the preamble as the president of King's Beach nor that he signed the agreement in this capacity requires a contrary conclusion. Indeed, the fact that $20,000 of the amount received by petitioners was represented by the note of Mizner personally counteracts the significance of the references to him in his official capacity in the agreement and, for aught that appears, Mizner could also personally have paid the $10,000 cash. In view of the foregoing, it can be argued that the transaction involved the sale or exchange of capital assets, since there appears to be no basis for finding that either the stock, the note, or the contingent claim constituted noncapital assets. The capital nature of the transaction would carry over and control the nature of the subsequent payment of $295,000 to the bank by petitioners. Cf. *Arrowsmith* v. *Commissioner,* 344 U.S. 6 (1952).

In large measure, the arguments of the parties have focused upon whether a "debt" arose in favor of the petitioners against King's Beach at the time of the payments by petitioners to the bank in 1963 and 1964. Such arguments have delved deeply into the law of suretyship and the purported differences between the rights of a guarantor and an indemnitor—differences which are at best obscure. Compare Restatement, Security, secs. 82 and 104 (1941) ; Restatement, Restitution, sec. 76 (1937) ; 41 Am. Jur. 2d 687–690. In our view, it is unnecessary to analyze the nuances which inhere in such differences and the impact thereof on the Federal income tax consequences of the transactions involved herein. We will assume for the purposes of decision that a "debt" did not arise in favor of petitioners. As a consequence, we need not deal with the question whether a "debt" must arise *at the time of payment* in order for *Putnam* v. *Commissioner, supra,* to apply. We note, however, that *Putnam* merely held that *if* there was an indebtedness *at the time of payment,* the right to a deduction was controlled by section 166. The Supreme Court did not deal with the situation where the claimed losses stemmed from a transaction which, had it been implemented in its original form, would have given rise to a "debt" or with the further question of the effect to be given to a subsequent relinquishment in advance of a claim for such "debt." [4]

But passing the "debt" issue does not dispose of this case. We still must determine whether the losses resulting from petitioners' payments to the bank were incurred in a "transaction entered into for profit" within the meaning of section 165 (c) (2) without regard to the capital loss limitation of section 165 (f). [5] In essence, petitioners contend that the pledge arrangement with the bank and the financial consequences thereof to petitioners should be treated separately from their investment in King's Beach and that, therefore, the limitation of section 165 (f) is necessarily inapplicable. We think this is an unacceptably simplistic approach to situations such as are involved herein. As has been stated in *United States* v. *Keeler,* 308 F. 2d 424, 434 (C.A. 9, 1962), the determination as to whether section 165 (f) applies to a loss incurred in a "transaction entered into for profit" is to be made "with reference not to hard and fast rules, but to the facts developed in each particular case."

The entire framework of the transactions involved herein was capital in nature. The pledge of collateral, which ultimately caused the

---

[4] The concurring opinion in *Bert W. Martin,* 52 T.C. 140, 147 (1969), on appeal (C.A. 9, July 2, 1969), merely reserved our position in cases where neither an actual nor potential indebtedness ever existed.

[5] Because of the large amount of reported capital gains in the years in question, the distinction between short-term and long-term capital loss is immaterial. Cf. secs. 1211 (b), 1212, and 1222.

payments now claimed as losses, was part and parcel of petitioners' purchase of stock in, and their direct loan to, King's Beach. They subsequently disposed of their stock, the direct debt of King's Beach to them, and their contingent future claim for reimbursement from King's Beach in a transaction which concededly was capital in nature.

Petitioners ultimately made *payment in full* [6] of the indebtedness of King's Beach secured by the collateral and the *payment was made to the creditor* bank and not to a third party. Since, by virtue of the May 23, 1963, agreement, petitioners no longer had any claim for reimbursement, the extinguishment of the potential indebtedness was clearly designed to improve the financial condition of King's Beach. Indeed, this seems to have been one of the purposes which motivated Mizner in making such agreement. These elements lend support to the "capital" characterization of the transaction, even though the payments by petitioners may not have constituted a "contribution to capital" in the strict sense of that term. (Cf. *Santa Anita Consolidated, Inc.*, 50 T.C. 536, 554–555 (1968), and *D. J. Condit*, 40 T.C. 24 (1963), affd. 333 F. 2d 585 (C.A. 10, 1964).)

In any event, the inescapable fact is that petitioners' payments were made in implementation of an undertaking given by them *at the time and as a condition of* their investment in King's Beach. Consequently, it can be said that, in a very real sense, the initial pledge of collateral and the requirement of potential future financial outlay which it embodied were in substance a part of the cost of petitioners' stock.[7]

Granted that several of the cases relied upon by petitioners contain broad language which seems to support their position, each case is clearly distinguishable on its facts. In *Hoffman* v. *United States*, 266 F. Supp. 884 (D. Ore. 1967), and *Eugene H. Rietzke*, 40 T.C. 443 (1963), the undertaking to the creditors which gave rise to the payments in question was that of a shareholder who was also the principal salaried officer of the debtor. More importantly, the undertaking was given subsequent to, and independently of, the acquisition of the original investment by the taxpayer. Under such circumstances, it would have been difficult to hold that the payments were part of the *cost of acquisition* of that investment.[8] The same situation obtained in *J. J. Shea*, 36 T.C. 577 (1961), affirmed per curiam 327 F. 2d 1002

---

[6] Since we have abjured the "debt" issue involved herein, we need not concern ourselves with the intricacies of partial payments stemming from the fact that the payments herein were divided between 2 taxable years. Compare *Eugene H. Rietzke*, 40 T.C. 443 (1963).

[7] Since $50,000 cash was clearly full consideration for the direct loan to King's Beach in that amount, any expenditure attributable to the implementation of the pledge should properly be considered part of the basis of the stock.

[8] The same is also true with respect to our decision in *Frank B. Ingersoll*, 7 T.C. 34 (1946), where we emphasized the business relationship which existed between the taxpayer and the creditor.

(C.A. 5, 1964), in addition to which the payment therein was not made to the creditor and did not reduce the primary indebtedness—in fact, it was made to a third person in consideration of the assumption of the taxpayer's share of the guaranty. In *D. J. Condit*, 40 T.C. 24 (1963), affd. 333 F. 2d 585 (C.A. 10, 1964), the loss in question arose out of a settlement between two partners or joint venturers. Cf. *Harry Horner*, 35 T.C. 231 (1960). In *Ansley v. Commissioner*, 217 F. 2d 252 (C.A. 3, 1954), the taxpayer was paid separately for the use of his collateral so that it can be said that the pledge itself separately constituted a "transaction entered into for profit." Cf. *J. J. Shea*, 36 T.C. at 581. It is also doubtful whether the decision retains its vitality in light of *Putnam v. Commissioner, supra*. But cf. *Stahl v. United States*, 294 F. Supp. 243 (D.D.C. 1969).

The essential fallacy in petitioners' position stems from their assumption that if the bad debt provisions of section 166 do not apply, their payments in connection with their pledge must necessarily be considered as entitling them to ordinary loss deductions because their investment in King's Beach was obviously made with the hope and expectation of profit. While the existence of a profit motive is obviously a necessary element, it is not in and of itself a ticket for an ordinary loss deduction under section 165(c)(2) without regard to section 165(f). The nature of the payments giving rise to the claimed losses must still be viewed in the context of the transaction as a whole. *United States v. Keeler, supra*. We are satisfied that, in the instant case, the arrangements from start to finish were the embodiment of a capital transaction. As the Supreme Court observed in *Putnam v. Commissioner*, 352 U.S. at 92–93:

We may consider Putnam's case in the light of these revealed purposes. His venture into the publishing field was an investment apart from his law practice. The loss he sustained when his stock became worthless, as well as the losses from the worthlessness of the loans he made directly to the corporation, would receive capital loss treatment; the 1939 Code so provides as to nonbusiness losses both from worthless stock investments and from loans to a corporation, whether or not the loans are evidenced by a security.[20] It is clearly a "fairer reflection" of Putnam's 1948 taxable income to treat the instant loss similarly. There is no real or economic difference between the loss of an investment made in the form of a direct loan to a corporation and one made indirectly in the form of a guaranteed bank loan. The tax consequences should in all reason be the same, and are accomplished by § 23(k)(4).[21] * * * [Footnotes omitted.]

We hold that the losses which the petitioners ultimately suffered by implementing their pledge are capital losses. Cf. *Estate of McGlothlin v. Commissioner*, 370 F. 2d 729 (C.A. 5, 1967), affirming 44 T.C. 611 (1965) ; *United States v. Keeler, supra; Estate of James M. Shannonhouse*, 21 T.C. 422 (1953). Compare *Arrowsmith v. Commissioner*, 344 U.S. 6 (1952). The fact that petitioners' expenditures followed

rather than preceded the disposition of their stock does not militate against this result. Cf. *Arrowsmith* v. *Commissioner, supra; Estate of James M. Shannonhouse, supra.* Compare also the treatment of payments by a purchaser of property in exchange for a private annuity. Rev. Rul. 55–119, 1955–1 C.B. 352, approved by this Court in *John C. W. Dix,* 46 T.C. 796 (1966), affirmed on another issue 392 F. 2d 313 (C.A. 4, 1968).

Reviewed by the Court.

*Decision will be entered for the respondent.*

DRENNEN, *J.,* concurs in the result.

———

STERRETT, *J.,* dissenting: Petitioner Meredith Siple paid the First National Bank of Nevada $150,000 in 1963 and $145,000 in 1964 and deducted said payments as ordinary losses on his tax returns for those years. We must consider why such payments were made to determine whether this asserted tax treatment was correct.

The payments were made after the bank stated in writing to petitioner that "Demand is made upon you in accordance with the indemnity agreement you signed on October 22, 1959." Pursuant *solely* to this demand the payments in question were made.

It then becomes appropriate to consider why petitioners entered into the October 22, 1959, indemnification agreement which caused the payments. Cf. *Arrowsmith* v. *Commissioner,* 344 U.S. 6 (1952).

Petitioners' participation in the aforenoted October 22, 1959, agreement was the direct result of their contract of the same date with the Mizners pursuant to which they agreed to invest in King's Beach. They agreed to make a substantial equity commitment, which through the exercise of certain options could have amounted to a 49-percent interest, and to make a $50,000 direct loan to King's Beach. Any losses suffered by petitioners through these investments were, of course, capital in nature. Secs. 165 (f) and 166 (d).

In this same agreement with the Mizners the petitioners further agreed to post collateral for a bank loan to King's Beach. They did supply such collateral and a loan was made. As stated above, some 4 and 5 years later petitioners were required to make good under the indemnification agreement.

The reasonable interpretation of the petitioners' agreement with the Mizners would seem to be that the petitioners desired to limit their capital investment in King's Beach to the equity and direct loan commitments which were specifically spelled out. If they had intended to make a further capital investment in King's Beach through the use of collateral, it would have been a simple matter for them to have borrowed the money themselves, thus incurring personal liability, and

to have then reloaned the money to the corporation. By eschewing this obvious possibility, they were limiting their capital investment. It does not seem to me to be a fair reading of the Mizner-Siple agreement to conclude that the Mizners required the Siples to agree to post the collateral as a prerequisite to the purchase of stock. Certainly there is nothing outside the agreement to support such a conclusion.

A reasonable assumption then is that, through the means of supplying collateral for a corporate loan, they sought to enhance their prospects for a profitable investment. If this be so, they are entitled to an ordinary loss arising from a transaction entered into for profit under the provisions of section 165 (c) (2), and I would so hold.

This simplistic [1] approach to the problem finds much support in decisions of this Court. In *J. J. Shea*, 36 T.C. 577, 582 (1961), affirmed per curiam 327 F. 2d 1002 (C.A. 5, 1964), we said the following with respect to that petitioner's purpose in entering into a guaranty: [2]

When the petitioner entered into the guaranty here involved, the business of the subsidiaries of Rupe, Inc., was being developed and expanded, and in entering into the guaranty *the petitioner had reason to believe that the corporations' use of the funds provided by the guaranty would enhance the value of his stock* in Rupe, Inc. * * * [Italics supplied.]

There the petitioner was seeking to realize a profit on only a 10-percent equity interest.

In *Marjorie Fleming Lloyd-Smith*, 40 B.T.A. 214, 222 (1939), affd. 116 F. 2d 642 (C.A. 2, 1941), certiorari denied 313 U.S. 588 (1941), we reached the same result with respect to the payment under a guaranty by the beneficial owner of a $37\frac{1}{2}$ percent. Therein we said:

the stock had become *worthless* by the close of *1932*. The *payments* in connection with the guaranty were not made until *1933*. Obviously, *when petitioner thus made them, it was not with the idea of protecting or adding to her stock investment in the company*. These expenditures occurred for the sole purpose of reducing her liability under the guaranty. As such, they are deductible as losses on a *transaction entered into for profit*. * * * [Italics supplied.]

It will be recalled that at the time of the payments to the bank the Siples held no interest of any kind in King's Beach, so this decision seems particularly in point.[3]

*Eugene H. Rietzke*, 40 T.C. 443 (1963), is a further example of our finding of a profit-making motive to the guaranty by a shareholder (45-percent interest) of the indebtedness of his corporation.

---

[1] It was once said that "Some cases task the anxious diligence of a court, not by their difficulty, but their simplicity." *Wells* v. *Savannah*, 87 Ga. 397, 398 (1891).

[2] Despite the fact that this term surely has more capital overtones than the term "indemnification." See *Putnam* v. *Commissioner*, 352 U.S. 82 (1956).

[3] The majority gives footnote attention of the agreement of May 23, 1963, between the Siples and Mizner, president of King's Beach, which completely terminated the Siples' interest in King's Beach, and to a suggestion that the agreement resulted in a capital transaction. The suggestion that the *Arrowsmith* doctrine then requires that the subsequent payment of $295,000 also be accorded capital treatment is, in my view, ill-founded for that payment was not in any sense an outgrowth of the May 23, 1963, agreement.

Significantly the majority opinion cites no cases in direct support of its holding that a capital transaction was involved. Instead it seeks, on what are in my judgment invalid grounds, to distinguish two of the foregoing cases and makes no mention of the third. The precedent value of these decisions is seriously undermined. The majority stresses the fact that in *Rietzke* and *Shea* the guaranties were subsequent to, and independent of, the acquisition of the original investment by the taxpayer. Thus, the clear implication is that these holdings may no longer be cited with any confidence to justify a section 165 (c) (2) loss where it is claimed with respect to a loss that occurred at the same time as an original investment. The majority's approach to the problem is indicated in its statement that "Under such circumstances, it would have been difficult to hold the payments were part of the cost of acquisition of that investment." All outlays made at the outset are now likely to be lumped together. It would seem to be unduly restricting congressional intent in enacting the forerunner of section 165 (c) (2).

Further, I do not find decisions of other courts such as *Ansley* v. *Commissioner*, 217 F. 2d 252 (C.A. 3, 1954), and *Hoffman* v. *United States*, 266 F. Supp. 884 (D. Oreg. 1967), distinguishable as does the majority.

I agree with the majority that the "debt" issue, see *Putnam* v. *Commissioner*, 352 U.S. 82 (1956), may be passed over, and note as my reasons that (1) an indemnitor who makes good a loss is not subrogated to the rights of the indemnitee, see *Howell* v. *Commissioner*, 69 F. 2d 447 (C.A. 8, 1934), (2) the May 23, 1963, agreement cut off whatever right the petitioners had against King's Beach by virtue of the 1959 agreement which right would have to be founded upon a breach of contract as distinguished from an action on a debt, and (3) Nevada case law concerning subrogation as set forth in *Stephens* v. *McCormack*, 50 Nev. 383 (1928).

It follows from the foregoing discussion that I respectfully dissent from the majority opinion.

WITHEY, FORRESTER, SCOTT, and FEATHERSTON, *JJ.*, agree with this dissent.